**CONTINENTAL LABORATORY PRODUCTS, INC., Plaintiff,**

v.

**MEDAX INTERNATIONAL, INC., Alma A. Timpson, Paul M. Jessop, Defendants.**

**No. 97–CV–0359 W JAH.**

United States District Court, S.D. California.

Sept. 18, 2000.

Kathleen A. Pasulka, Edward C. Schewe, Brown, Martin, Haller & McClain, San Diego, CA, for Plaintiff.

Thomas J. Rossa, Holme Roberts & Owen LLP, Salt Lake City, UT, for Defendants.

### CORRECTED MEMORANDUM OPINION RE: TRADE DRESS CLAIMS

WHELAN, District Judge.

Defendants Medax International, Inc. and individual Defendants Alma A. Timpson, Jr. and Paul M. Jessop filed a motion for summary judgment against Plaintiff's claims for trade dress infringement and unfair competition.[1]

---

[1] On July 7, 2000 this Court issued an order granting Defendants' motion for summary judgment and entering final judgment in favor of Defendants on all claims. (*See Memorandum Opinion and Order re: Trade Dress Claims.*) This memorandum incorporates several minor editorial changes and corrections. Because more than 10 days have passed since entry of final judgment, this memorandum cannot effect any change in the judgment or extend the time to appeal. *See* Fed.R.Civ.P. 59(d)–(e); *Burnam v. Amoco Container Co.,* 738 F.2d 1230, 1231 (11th Cir. 1984) (per curiam) (holding that district court has limited authority under Rule 59 to alter or amend judgment *sua sponte* so long as court acts within 10 days of entry of judgment); *Scott v. Younger,* 739 F.2d 1464, 1467 (9th Cir.1984) (holding that 10 day period under Rule 59 is jurisdictional and cannot be waived by the district court).

I. BACKGROUND

Medical and research laboratories perform large numbers of repetitive tests that require scientists to add precise amounts of certain chemical or biological materials to hundreds of test tubes. This process involves injecting the material through a disposable pipette tip that is attached to a pipetting tool. Pipette tips are typically discarded after use. To facilitate use, disposable pipette tips are sold in trays with the tips arranged for connection to a multi-headed pipetting tool. Empty trays may be reused by reloading them with pipette tips.

In the past, manufacturers of disposable pipette tips distributed them in large packages with 10 trays per box, each tray holding 96 tips. The trays and packaging were usually discarded after use, producing significant quantities of solid waste. In recent years, research laboratories have sought to reduce this solid waste by developing systems to package and arrange pipette tips to enable laboratory researchers to reuse the trays and to purchase additional pipette tips without incurring the expense of buying additional trays.

A. THE PARTIES' PRODUCTS

Plaintiff Continental Laboratory Products, Inc. ("Continental") manufactures and sells biomedical research products. In 1992, Larry G. Scaramella invented an environmentally friendly and space-efficient pipette tip packaging system. On June 28, 1994 the Patent and Trademark Office awarded Scaramella U.S.Patent No. 5,324,-482 ("the '482 Patent"), which he assigned to David A. White, president of Continental. The '482 Patent, entitled "Pipette Tip Packaging System," teaches an efficient pipette storage and distribution system that cuts down on packaging materials, reduces the amount of solid waste and uses space more efficiently.

Continental's primary product, the esp® pipette tip system, implements the invention disclosed in the '482 Patent. The esp® system stores pipette tips within an outer box that slips off to reveal a separate white cardboard container ("card-holding container").[2] The container holds two stacks of five plastic pipette tip holder cards. Each card is filled with 96 pipette tips, and the cards are stacked and nested vertically. To facilitate the removal and transfer of the pipette tips from the container, the product includes a transfer plate that secures itself atop the holder cards and permits the user to successively remove and transport the holder cards. The sides of the container have four V-shaped openings, two along each side. The openings enable the user to successively engage and lift each holder card from the stack using the transfer plate. Continental claims the design of its card-holding container comprises protectable trade dress.

Defendant Medax International, Inc. ("Medax") manufactures and sells TRANSAX, a pipette tip packaging system remarkably similar to the Continental esp® system. As with the Continental product, TRANSAX stores pipette tips inside a white card-holding container with V-shaped openings to facilitate removal of the holder cards. (See Decl. of David A. White ("White Decl."), Exs. 11–13.) Defendants have produced TRANSAX with three different interior box designs: (1) four V-shaped openings similar in appearance to Continental's esp® system, (2) four U-shaped openings and (3) two U-shaped openings. (Defs.' Exs. 10, 31, 12.)

B. RELEVANT PROCEDURAL HISTORY

On March 4, 1997 Continental commenced this action against Defendant Medax, alleging claims for patent infringement, contributory infringement, trade

2. Previous orders and motions referred to the interior box as Continental's "inner packaging." The Court will instead refer to the box as the "card-holding container," which more

accurately describes its purpose and avoids the inaccurate legal classification as product packaging. See Part III.B, infra.

dress infringement and unfair competition. On December 30, 1998 Continental filed the currently operative First Amended Complaint that added individual Defendants Alma A. Timpson, Jr., president of Medax ("Timpson") and Paul M. Jessop, vice president and general manager of Medax ("Jessop"). Continental's First Amended Complaint accuses Defendants of infringing the '482 Patent and of copying the esp® system's allegedly distinctive trade dress.

Continental's patent infringement and trade dress claims have dominated several pretrial motions in this matter, including a motion to dismiss, three summary judgment motions filed by Defendants and one by Continental. Despite this long procedural history, only two previously entered orders have significant relevance to this litigation. The first order, issued August 12, 1999, granted Defendants' motion for summary judgment against Continental's claims for patent infringement and contributory infringement, and found as a matter of law that Continental could not establish infringement of the '482 Patent. (*See Memorandum Opinion and Order*, 1999 U.S.Dist. LEXIS 15383, 1999 WL 33116499.)

The second order, issued September 21, 1999, denied Defendants' previous motion for summary judgment as to Continental's claims for trade dress infringement and unfair competition. The Court noted that Defendants' motion devoted a mere three pages to addressing the elements of trade dress infringement and did not adequately present the relevant legal or evidentiary issues. (*See Order Denying Defendants' Motion for Summary Judgment re: Trade Dress Claim* at 6:16–17.) Because the motion appeared to have underlying merit, however, the Court granted Defendants "leave to file a broad and comprehensive

motion for summary judgment that attacks each and every element of trade dress infringement, both from a legal and evidentiary standpoint." (*Id.* at 20:12–14.) The Court advised Continental that in the event Defendants filed such a motion, Continental "must come forward with all evidence supporting the elements of secondary meaning and likelihood of confusion." (*Id.* at 20 n. 8.) On October 25, 1999 Defendants filed a new motion for summary judgment against the trade dress claims.[3]

## II. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates entry of summary judgment where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A fact is "material" when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A "genuine issue" of material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The moving party can satisfy this burden by affirmatively presenting evidence that negates an essential element of the nonmoving party's case, or by demonstrating that the nonmoving party cannot provide evidence to support an essential element upon which it will bear the burden of proof at trial. *Id.* at 322–23, 106 S.Ct. at 2552–53.

---

**3.** On March 23, 2000 this Court issued a separate order resolving Defendants' procedural objections to the affidavits of two undisclosed expert witnesses. (*See Order (1) Resolving Procedural Objections to Affidavits of Daniel M. Cislo and Dr. Harold Kassarjian; (2) Permitting Additional Briefing on Inherent*

*Distinctiveness*, 2000 U.S.Dist. LEXIS 12497, 2000 WL 1224818.) That Order, which is incorporated herein by reference, struck the affidavits of Continental expert witnesses Daniel M. Cislo and Dr. Harold Kassarjian for failure to comply with a pretrial scheduling order.

Once the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment by merely demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir.1995) (citing *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)).

When making this determination, all inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus.*, 475 U.S. at 587, 106 S.Ct. at 1356. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

### III. DISCUSSION

Defendants move for summary judgment on the ground that Continental cannot come forward with evidence to support its claims for trade dress infringement.

### A. TRADE DRESS

Continental's trade dress claims arise under Section 43(a) of the Lanham Act, which provides a cause of action against any person who uses "any symbol or device ... likely to cause confusion ... as to the origin ... of his or her goods." 15 U.S.C. § 1125(a). This provision protects not only words and symbols, but also "trade dress," a category that includes the packaging and design of a product. *Wal-Mart Stores, Inc. v. Samara Bros. Inc.*, 529 U.S. 205, ——, 120 S.Ct. 1339, 1342, 146 L.Ed.2d 182 (2000).

■ In the Ninth Circuit,[4] trade dress "refers to the 'total image of a product' and may include features such as size, shape, color, color combinations, texture or graphics." *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir.1993); *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989). To establish trade dress infringement, Continental must show (1) that its product design is non-functional, (2) that the design is inherently distinctive or has acquired a secondary meaning, and (3) that there is a likelihood of confusion. *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1005 (9th Cir.1998). Because affording trade dress protection to product designs may hinder legitimate competition, the Ninth Circuit has advised district courts to evaluate such claims with greater scrutiny than claims involving other forms of trade dress. *Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1012–13 (9th Cir.1999).

Continental defines its trade dress as the "product configuration" for its "inner packaging," referring to the design of the card-holding container. (Pl.'s Opp'n at 6:11–15.)

### B. INHERENT DISTINCTIVENESS

■ Defendants first contend that Continental cannot establish distinctiveness for its product design. Continental responds by arguing that its design is inherently distinctive and has attained secondary meaning among consumers.

Shortly after Continental filed its opposition to Defendants' motion for summary judgment, the Supreme Court handed

---

4. Although the operative First Amended Complaint includes claims arising under the Patent Act, regional circuit law, in this case the Ninth Circuit, provides the governing substantive law for Lanham Act claims. *Al-Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308, 1326 (Fed.Cir.1999).

down *Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000), which has a significant impact on this motion. In *Wal–Mart Stores,* the Supreme Court held that product *design* cannot qualify as inherently distinctive under the Lanham Act and may receive protection only upon a showing of secondary meaning. *Id.* at ——, 120 S.Ct. at 1346. The Supreme Court rested its decision on two rationale. First, the Court noted that, unlike word marks or product packaging, consumers do not generally rely on product design as an indicator of origin:

> It seems to us that design, like color, is not inherently distinctive. The attribution of inherent distinctiveness to certain categories of word marks and product packaging derives from the fact that the very purpose of attaching a particular word to a product, or encasing it in a distinctive package, is most often to identify the product's source ... In the case of product design, as in the case of color, we think that consumer predisposition to equate the feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs ... is intended not to identify source, but to render the product itself more useful or appealing.

*Id.* at ——, 120 S.Ct. at 1344. Second, the Supreme Court reasoned that the minimal possibility that an inherently distinctive product design could exist was heavily outweighed by the anticompetitive effects created by an unclear, incoherent and unpredictable legal standard:

> Consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves by a rule of law that facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness. How easy it is to mount a plausible suit depends, of course, upon the clarity of the test for inherent distinctiveness, and where product design is concerned we have little confidence that a reasonably clear test can be devised ...
>
> Competition is deterred ... not merely by successful suit but by the plausible threat of successful suit, and given the unlikelihood of inherently source-identifying design, the game of allowing suit based upon alleged inherent distinctiveness seems to us not worth the candle.

*Id.* at ——, 120 S.Ct. at 1344–45. The Supreme Court acknowledged that adopting a categorical distinction between product design and product packaging "will force courts to draw difficult lines," but advised courts, in close cases, to "err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning." *Id.* at ——, 120 S.Ct. at 1345–46. "The very closeness will suggest the existence of relatively small utility in adopting an inherent-distinctiveness principle, and relatively great consumer benefit in requiring a demonstration of secondary meaning." *Id.* at ——, 120 S.Ct. at 1346.

This Court invited both parties to submit supplemental memoranda addressing the affect of *Wal–Mart Stores* on Continental's trade dress claims. Defendants responded by arguing that Continental's allegedly distinctive trade dress is product design. Continental responds, predictably, that its trade dress qualifies as product packaging.[5]

---

**5.** Continental also contends that the removable slip-off lid, or its "outer packaging," qualifies as product packaging under *Wal–Mart Stores.* This argument lacks relevance for two reasons. First, the Honorable Judith N. Keep, who presided over this case until November 1998, granted a previous summary judgment motion and eliminated the slip-off lid as a basis for trade dress infringement. (*See Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment.*) Judge Keep essentially concluded that the differences in color, design and overall appearance of the Continental and Medax slip-off lids, coupled with the clarity of Defendants' labeling, precluded any likelihood of confusion. (*Id.* at 11–12.) Second, Continental's opposition to Defendants' motion explicitly concedes that only the interior container (misleadingly referred to as the "inner pack-

Fortunately, this case does not require difficult line drawing; a common-sense functional analysis of the card-holding container confirms that it represents an integral part of the design of Continental's pipette product. The container performs several functions critical to the overall product, including holding and storing the pipette tips in their nested configuration and facilitating easy user access to each row in the holder card stack. The user does not discard the card-holding container upon receipt of the product, but rather, the container remains until the customer has put all of the pipette tips to use.

Because the container is physically and functionally inseparable from the whole of Continental's pipette product, it is product design, "and therefore protectable, only upon a showing of secondary meaning." *Wal–Mart Stores,* 529 U.S. at ——, 120 S.Ct. at 1346.[6]

### C. SECONDARY MEANING

Defendants next contend that Continental cannot produce evidence to establish that the design of its card-holding container has achieved secondary meaning.

### 1. SECONDARY MEANING—STANDARD

To establish a claim for trade dress infringement based on a product design, the plaintiff must show that its design has attained secondary or "acquired" meaning.

*Wal–Mart Stores,* 529 U.S. at ——, 120 S.Ct. at 1344. Secondary meaning exists when, "in the minds of the public, the primary significance of a [design] is to identify the source of the product rather than the product itself." *Id.* at ——, 120 S.Ct. at 1343 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851, n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982)). "The test of secondary meaning is the effectiveness of the effort to create it, and the chief inquiry is directed towards the consumer's attitude about the mark in question: does it denote to him a single thing coming from a single source?" *Carter–Wallace, Inc. v. Procter & Gamble Co.,* 434 F.2d 794, 802 (9th Cir.1970) (internal quotation omitted); *International Jensen,* 4 F.3d at 824. The plaintiff bears the burden of showing its mark or design obtained secondary meaning before the defendant commenced its allegedly infringing activities. *Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1358 (9th Cir. 1985) (en banc); *Braun, Inc. v. Dynamics Corp. of Am.,* 975 F.2d 815, 826 (Fed.Cir. 1992) ("A claim of trade dress infringement fails if secondary meaning did not exist before the infringement began.").

A plaintiff may establish secondary meaning through direct and circumstantial evidence. *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair*

---

aging" in earlier motions and orders) remains at issue. (Pl.'s Opp'n at 6:11–15.)

**6.** To the extent any aspects of Continental's alleged trade dress qualify as product packaging, Continental has failed to present any admissible evidence of inherent distinctiveness. Continental offers only two pieces of evidence: (1) the affidavit of Daniel M. Cislo, an expert witness, and (2) the affidavit of David A. White, Continental's president. (Pl.'s Opp'n at 7:4–8.) By order dated March 23, 2000 the Court struck the Cislo affidavit because Continental failed to timely disclose Cislo as an expert witness. *See* footnote 3, *supra.* This leaves only the affidavit of David A. White, Continental's president, who merely claims that the Continental product represented a "complete departure" from other products available in the market. (Decl. of David A. White ¶ 7.) The alleged uniqueness of Con-

tinental's product design, however, does not show inherent distinctiveness. *See Pebble Beach Co. v. Tour 18 I Ltd.,* 155 F.3d 526, 541 n. 7 (5th Cir.1998) (noting that inherent distinctiveness requires more than evidence of a design's uniqueness); *Turtle Wax, Inc. v. First Brands Corp.,* 781 F.Supp. 1314, 1321 (N.D.Ill.1991) (holding that trade dress does not qualify as inherently distinctive merely because no previous product combines the same elements: "Any other rule essentially would require a finding of inherent distinctiveness whenever a new product enters the market."). Without the expert affidavit, Continental has no evidence as to several of the factors relevant to inherent distinctiveness. *See Seabrook Foods, Inc. v. Bar–Well Foods Ltd.,* 568 F.2d 1342, 1344 (C.C.P.A.1977) (articulating standard for establishing inherent distinctiveness of product packaging).

*Competition* § 15:30 (4th ed. 2000) ("McCarthy"). Direct evidence, such as consumer surveys and direct consumer testimony, often provides the strongest evidence of secondary meaning. *Levi Strauss & Co.,* 778 F.2d at 1358; *Vision Sports,* 888 F.2d at 615. A plaintiff may also establish secondary meaning through circumstantial evidence, such as: exclusivity, manner, and length of use, amount and manner of advertising, amount of sales and the number of customers, and plaintiff's established place in the market. *Filipino Yellow Pages v. Asian Journal Publications,* 198 F.3d 1143, 1151 (9th Cir.1999); *Clamp Mfg. Co., Inc. v. Enco Mfg. Co., Inc.,* 870 F.2d 512, 517 (9th Cir.1989). Evidence of deliberate copying may, in appropriate cases, support an inference of secondary meaning. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 844–45 (9th Cir.1987).

## 2. SECONDARY MEANING—DISCUSSION

Continental admits that it has no direct evidence of secondary meaning, such as customer surveys or testimony. Instead, Continental relies on the following circumstantial evidence: (1) $100,000 in advertising and promotional expenditures since the introduction of its esp® product line, (2) sales of approximately $10,000,000, (3) Continental's exclusive use of its design for several years, (4) two affidavits, one from a Continental employee and another from a consultant, and (5) evidence of deliberate copying. (*See* Pl.'s Opp'n at 7–11.) For the reasons expressed below, the Court finds this evidence, individually and collectively, insufficient to raise a genuine issue of material fact on the issue of secondary meaning.

### i. ADVERTISING EXPENDITURES

■ Continental first argues that its substantial advertising and promotional efforts support a finding that the design of its card-holding container has achieved secondary meaning. Defendants respond that Continental's alleged advertising expenditures are paltry and insubstantial, and that Continental offers no evidence as to their effectiveness.

The Ninth Circuit's decision in *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378 (9th Cir.1987) governs whether advertising expenditures support a finding of secondary meaning:

> Evidence of sales, advertising and promotional activities may be relevant in determining whether a trade dress has acquired a secondary meaning ... However, the advertising and promotional activities must involve "image advertising," that is, the ads must feature in some way the trade dress itself. Otherwise, even evidence of extensive advertising or other promotional efforts would not necessarily indicate that prospective buyers would associate the trade dress with a particular source. A large expenditure of money does not in itself create legally protectable rights. The test of secondary meaning is the effectiveness of the effort to create it.

*Id.* at 1383 (internal quotations, citations and alterations omitted). The facts in *First Brands* illustrate this concept. The plaintiff in that case sought to establish secondary meaning for its yellow antifreeze container by introducing evidence of its total advertising expenditures and its five-year, exclusive use of the container. *Id.* The district court denied plaintiff's request for injunctive relief on the ground that plaintiff's advertisements did not emphasize the color and shape of the antifreeze jug and therefore did not contribute to secondary meaning. The Ninth Circuit agreed, noting that plaintiff's advertising, although extensive, did not "attempt to engender consumer identification with the yellow, F-style jug" and "did not, for example, urge consumers to look for the 'familiar yellow jug.'" *Id.*

Continental's evidence of alleged advertising and promotional efforts derives from a few sentences in the affidavit of its president, David A. White, and from several attached exhibits. (*See* Decl. of David A. White ¶¶ 9–15, Exs. 14–19.) Having care-

fully reviewed this evidence, the Court finds it insufficient to raise a genuine issue of material fact.

First, Continental provides a two-sided color flyer it claims to have distributed sometime between late 1992 and early 1993. (*Id.* ¶ 24, Ex. 14.) The front side of the flyer does not include a picture or description of the card-holding container. The top-half of that side shows a female hand grasping a holder card filled with 96 empty pipette tips, in front of a photograph of a mountainous terrain with the slogan at the top: "Saving the Environment ..." The bottom-half contains a textual description of the esp® system, claiming that it reduces packaging waste by 70% and storage space by 78% compared to other competing designs. *See* 2 McCarthy, *supra*, § 15:52 ("[A]dvertising that promotes the utilitarian advantages of a product and does not call attention to the design ... is little if any evidence of secondary meaning."). The reverse side includes a photograph showing an exploded view of the contents of the pipette system, including the exterior box and the card-holding container filled with pipette tips. The container, however, is largely obscured by a female hand grasping a filled pipette holder card, and is the least noticeable object in the photo. Overall, the flyer promotes the esp® packaging and racking system but does not engender consumer identification with the design of the card-holding container. *First Brands*, 809 F.2d at 1383.

Moreover, even assuming the flyer drew attention to the card-holding container, Continental provides no evidence as to the number of flyers distributed, how they were distributed and who received them. *See Echo Travel, Inc. v. Travel Associates. Inc.*, 870 F.2d 1264, 1269–70 (7th Cir.1989) (summary judgment properly granted against trademark plaintiff who placed 25,000 promotional posters on college campuses but failed to provide evidence as to the amount of time the posters remained hanging, number of students at various campuses, and other relevant demographic evidence). Continental provides no evidence that this brief run of promotional flyers, to an unidentified number of recipients, had any effectiveness in creating secondary meaning.

Second, Continental provides a booklet from the 1993 "Most Innovative New Products Competition," sponsored by the University of California, San Diego. (White Decl. ¶ 25, Ex. 15.) The booklet describes numerous products introduced in 1993 by various biomedical, communications, electronics and computer software companies throughout San Diego County. The booklet lists and describes the Continental pipette product as an entrant in the contest and provides a three-sentence textual description. However, it does not include a picture or description of the card-holding container, nor does it even make reference to it. (*Id.* at 5.) Continental offers no evidence as to the number of booklets that were distributed, or who received them. Continental does not contend the booklet experienced significant circulation outside the San Diego area or that it reached any of Continental's potential customers.

Third, Continental points to a small advertisement that ran in the March 1997 issue of *Biotechnology Laboratory* magazine. (White Decl. ¶ 26, Ex. 16.) The advertisement consumes approximately one-twelfth of one page and includes a tiny photograph of the Continental product, including the card-holding container. Even assuming this advertisement prominently featured the container (which it does not), it lacks legal relevance because it ran the same month Continental commenced this litigation and approximately four months after Defendants' began their allegedly infringing activities. As discussed previously, Continental bears the burden of showing that secondary meaning existed before December 1996, the date Defendants' commenced their allegedly infringing activities. *Levi Strauss & Co.*, 778 F.2d at 1358; *Braun*, 975 F.2d at 826. Continental does not contend that it ran this advertisement before March 1997.

Fourth, Continental provides several product catalogs, including Continental's 1995 and 1998 product catalogs and a 1998–1999 product catalog from Fisher Scientific, Continental's nationwide distributor. (White Decl. ¶¶ 27, 28, Exs. 17–19.) The 1998 Continental catalog and the 1998–1999 Fisher Scientific catalog, however, have no relevance because they were produced and distributed years after Defendants' began their allegedly infringing activities. (Id. Exs. 18–19.) As for the remaining 1995 Continental catalogs, the card-holding container appears in a single photograph in a catalog series that spans more than 90 pages. (Id. Ex. 17 at 60.) This single reference in the product catalog does little to bestow source-identifying significance upon the design of the card-holding container. Continental provides no evidence regarding distribution of this catalog and makes no attempt to approximate the number of customers or potential customers who received it.

Finally, Mr. White's affidavit claims Continental has spent "well over $100,000 in promotion and advertising" of its esp® product line over the past seven years, and has benefitted from the promotional efforts of its nationwide distributor, Fisher Scientific. (Id. ¶¶ 9, 15.) This evidence lacks probative value for a variety of reasons. Continental's alleged $100,000 promotional expenditure, over a seven year period, amounts to a paltry $15,000 per year, often the cost of a single advertisement in a national publication. Continental offers no evidence as to how it put these funds to use, nor does it provide a coherent explanation as to how these expenditures contribute to secondary meaning. See Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 872 (8th Cir.1994) (recognizing importance of itemizing promotional expenses because not all such expenses contribute to the creation of secondary meaning). Notably, White fails to itemize the amounts actually spent between August 1992 and December 1996— the only relevant period. Other than the product flyer described earlier, Mr. White does not identify any promotional activities that occurred before Defendants' alleged infringement. Finally, Mr. White makes no attempt to identify Fisher Scientific's alleged promotional efforts.

In sum, the Court finds Continental's promotional and advertising activities so insubstantial that they undermine any inference of secondary meaning. The undisputed evidence reveals that Continental's promotional and advertising efforts before December 1996 consist of: (1) a flyer distributed to an unknown number of recipients, during a short period between late 1992 and early 1993, that does not emphasize the card-holding container; (2) a booklet memorializing the esp® product's entry into a local innovative products contest, distributed to an unknown number of recipients, that does not include a picture or description of the allegedly distinctive container; (3) a series of product catalogs distributed in an unknown manner, to an unknown number of recipients; and (4) a blanket assertion of having spent $100,000 in advertising and promotion, with no itemization or description of how or when Continental spent the money and no explanation as to how the expenditures contributed to secondary meaning. The undisputed evidence essentially reveals that Continental made no effort to develop secondary meaning for the design of its card-holding container until after it commenced this litigation. Its alleged advertising and promotional expenditures, viewed collectively, fail to raise a genuine issue for trial.

### ii. RAW SALES FIGURES

Continental next relies on total product sales figures as evidence of secondary meaning. According to Continental, the esp® product has enjoyed significant sales in the marketplace since its introduction.

It is well-established that evidence of a product's success in the marketplace does not necessarily show that its design has secondary meaning:

Sales success by itself will typically not be as probative of secondary meaning in a product configuration case as in a

trademark case, since the product's market success may well be attributable to the desirability of the product configuration rather than the source-designating capacity of the supposedly distinguishing feature or combination of features. And unlike with a trademark, where repeated purchases of a product support an inference that consumers have associated the mark with the producer or source, one can much less confidently presume that a consumer's repeated purchase of a product has created an association between a particular product configuration and the source.

*Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.,* 40 F.3d 1431, 1452–53 (3d Cir.1994); *see also Cicena Ltd. v. Columbia Telecomm. Group,* 900 F.2d 1546, 1551 (Fed. Cir.1990) ["[S]ales success is not necessarily indicative of secondary meaning, but can be attributed to many other factors[.]"]; *Aromatique,* 28 F.3d at 873 ("Because the proper inquiry is whether the evidence demonstrates that the purchasing public identifies the asserted mark with the source of the product, sales figures alone are inadequate to establish a connection between a product and its source."); *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.,* 568 F.2d 1342, 1345 (C.C.P.A.1977) (noting that evidence of sales "may have relevance in establishing secondary meaning [but is] not necessarily indicative of recognition of the mark by purchasers as an indication of source of the goods."); McCarthy § 15:47 at 15–67 ("Popularity of a product is not synonymous with secondary meaning. Large sales of the product may be due to dozens of factors, only one of which may be the drawing power of the trademark.").

Here, Continental offers a table summarizing its annual sales, including number of units sold and resulting revenue, for the period between 1993 and October 1999. (*See* Decl. of Robert R. Trout ¶ 2, Ex. B.)

The chart indicates that Continental sold more than 400,000 units, generating $10,000,000 in revenue.[7]

The Court finds this evidence unhelpful for two reasons. First, more than half of the sales reflected in the chart occurred *after* Defendants' commenced their allegedly infringing activities in December 1996. As discussed in the preceding section of this Order, post-infringement activities have no legal relevance to whether the design of the card-holding container obtained secondary meaning by December 1996. *Braun,* 975 F.2d at 826; *Burke–Parsons–Bowlby Corp. v. Appalachian Log Homes, Inc.,* 871 F.2d 590, 596 (6th Cir.1989) (substantial sales irrelevant to secondary meaning where evidence failed to show that sales occurred prior to defendant's alleged infringement). Removing 1997 through 1999 from Continental's sales volume chart results in total sales of approximately 229,000 units between 1992 and December 1996, yielding revenues of $4.76 million. Thus, Continental sold more than 246,000 units, resulting in revenues of $5.02 million, after Defendants' commenced their allegedly infringing activities.

■ Second and more fundamentally, Continental has failed to provide any supporting data to place these raw sales figures into a coherent evidentiary context. For example, Continental offers no evidence as to the size of the relevant market or the market share Continental achieved by December 1996. The Court cannot determine whether these sales numbers reflect success in the pipette tip industry or simply the rapid gains achieved by any new product that emerges within a large and growing market. Continental makes no attempt to compare its sales to those of its competitors. Continental presents no evidence as to the geographic distribution of its sales or the average number of units purchased per customer.[8] To make mat-

7. The chart did not provide unit sold information for 1993 and 1994. The Court approximated these figures at 35,240 and 47,000, respectively, based on $20 average per unit revenue reflected between the years 1995 to 1998.

8. For reasons not clear to the Court, Continental's sales chart includes information not relevant to determining secondary meaning, such as the cost of goods sold, profits and per-year profit margin percentages.

ters worse, Continental sells its pipette tips to customers who make volume and repeat purchases, including universities, hospitals and biotechnology companies. (Decl. of Tom Manness ¶ 4; Third Aff. of Paul Jessop ¶ 9.) Without evidence pertaining to the frequency of repeat and volume purchases, the Court can only speculate as to the number of distinct customers. Finally, Continental's sales increased steadily between 1993 and 1996 despite the dearth of significant promotional efforts, strongly suggesting that market demand for a useful product, rather than the distinctiveness of its design, explains Continental's purported success.

Continental does not attempt to explain how its alleged sales success has any relationship to the attainment of secondary meaning in the minds of the consuming public, nor does it provide any evidence that could permit a reasonable jury, without engaging in speculation and conjecture, to draw such an inference. Thus, Continental's ambiguous sales evidence fails to raise a genuine issue as to whether the design of the card-holding container has obtained secondary meaning.

### iii. LENGTH OF EXCLUSIVE USE

Continental also contends the Court may infer secondary meaning from Continental's exclusive use of its design between August 1992 and December 1996, the period between product introduction and the date Defendants commenced their alleged infringement.

■ There is no talismanic number of months or years that establishes when an unregistered trademark or trade dress can obtain secondary meaning. Length of time "is merely one additional piece of evidence to be weighed with all others in determining the existence of secondary meaning." McCarthy § 15:53 at 15–77. "After all, a party's time and exclusivity of use merely provide the opportunity to build source identification in the public mind." *Sassafras Enters., Inc. v. Roshco, Inc.*, 915 F.Supp. 1, 9 (N.D.Ill.1996). Whether secondary meaning attaches after

a period of exclusive use depends on how, rather than how long, the plaintiff used its mark or design. If the plaintiff engaged in widespread promotional activities, its mark or design can obtain secondary meaning in a short period. *See, e.g., L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1130 (Fed.Cir.1993) (secondary meaning achieved for sports shoe design after only six months due to extensive advertising and promotion); *Maternally Yours v. Your Maternity Shop*, 234 F.2d 538, 544 (2d Cir.1956) (secondary meaning achieved for name of maternity apparel store after 11 months due to extensive advertising and promotion). A lack of evidence supporting the other factors relevant to secondary meaning, however, can diminish the probative value of even a long period of exclusive use. *See Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785, 788 (5th Cir.1984) (no secondary meaning for "Bank of Texas" mark despite nine years of exclusive use because plaintiff did not promote its mark outside narrow geographic area) (affirming judgment notwithstanding the verdict); *Walt–West Enters., Inc. v. Gannett Co., Inc.*, 695 F.2d 1050, 1060 (7th Cir.1982) (no secondary meaning for term "107" used to identify radio station and its FM frequency despite 10 years of exclusive use because plaintiff's advertising expenditures did not lead listeners to "regard the primary significance of the term as designating a single, though perhaps anonymous, source of radio broadcasts.") (affirming summary judgment); *Sassafras*, 915 F.Supp. at 9 (no secondary meaning for design of home pizza making set despite 15 years of exclusive use because of the absence of "any hard evidence of secondary meaning.") (granting summary judgment); *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 378 (1st Cir. 1980) (no secondary meaning for green cylindrical can despite 40 years of exclusive use; relying on concepts of functionality) (reversing district court's findings); *cf. Al–Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308, 1327 (Fed.Cir.1999) ["[S]ole use of a design is a preliminary step for a descrip-

tive trade dress to acquire distinctiveness and secondary meaning."] (reversing jury verdict).

Here, Continental's four-year period of exclusive use provided ample time for its design to obtain secondary meaning. However, secondary meaning cannot emerge in a vacuum, and the undisputed evidence detailed earlier confirms that Continental undertook only trivial efforts to create secondary meaning during this period of exclusive use. Aside from product catalogs and a brief run of product flyers, both distributed in unknown manner to an unknown number of recipients, Continental cannot identify any advertising or promotional activities. Moreover, Continental's annual sales statistics do not contribute to secondary meaning for the reasons stated earlier.

In sum, Continental's nonextant promotional expenses and its incomplete sales evidence diminish the probative weight of Continental's length of exclusive use as evidence of secondary meaning, and fail to raise a genuine issue for trial.

### iv. DECLARATIONS FROM CONTINENTAL'S EMPLOYEES AND CONSULTANTS

■ Continental offers two affidavits, one from a long-time employee and another from a consultant, to support its contention that its product design has obtained secondary meaning. (*See* Decl. of Robert R. Buchner ("Buchner Decl."), Decl. of Douglas B. Rowe ("Rowe Decl.").) Both affiants claim that they "associate" the esp® product's design with Continental. Defendants contend that the Court should disregard these two declarations under Rule 402 of the Federal Rules of Evidence because (1) the beliefs of Continental's employees and affiliates do not reflect the views of consumers and because (2) the statements lack evidentiary foundation. (*See* Defs.' Reply at 3:13–22.)

The Ninth Circuit has held that affidavits of employees and close affiliates of a trademark holder carry *de minimus* evidentiary weight in determining whether a trademark has acquired secondary mean-

ing, and cannot defeat a defendant's motion for summary judgment. In *Self–Realization Fellowship Church v. Ananda Church of Self–Realization*, 59 F.3d 902 (9th Cir.1995), the Ninth Circuit affirmed a grant of summary judgment based on lack of secondary meaning where:

> The only evidence [plaintiff] offers are declarations of its employees and wholesalers that they think of [plaintiff] when they hear the term "Self-realization." However, we agree with the district court that these declarations had little probative value regarding the assessment of consumer perception because they were from [plaintiff's] employees and wholesalers. Trademark law is skeptical of the ability of an associate of a trademark holder to transcend personal biases to give an impartial account of the value of the holder's mark. Attestations from persons in close association and intimate contact with (the trademark claimant's) business do not reflect the views of the purchasing public.

*Id.* at 910 (internal quotations, citations and alterations omitted). The court went on to hold that the declarations did not raise a genuine issue as to whether plaintiff's trademark had secondary meaning because "[plaintiff's] declarants have too close an affiliation with [plaintiff] for their account of the association between 'Self-realization' and [plaintiff] to reliably describe the perceptions of consumers in general." *Id.; id.* at 912.

The Ninth Circuit reiterated this principle in *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143 (9th Cir.1999), which affirmed a grant of summary judgment based on plaintiff's failure to produce evidence of secondary meaning. The plaintiff in that case resisted the defendant's motion by submitting an affidavit from its founder and president declaring that plaintiff had suffered lost revenues due to the confusing similarity of the name of defendant's product. *Id.* at 1151. The Ninth Circuit held that the affidavit could not defeat summary judg-

ment because "[e]vidence of secondary meaning from a partial source possesses very limited probative value." *Id.* The court found the affidavit lacking in evidentiary value because it was "vague, uncorroborated, and clearly self-interested," and because it "emanat[ed] from a far-from-objective source." *Id.*[9]

These cases reveal two related rationale for discounting the significance of affidavits provided by a trademark holder, its employees and other close affiliates. First, both decisions emphasize that statements from those affiliated with a trademark holder, such as employees, do not accurately reflect the consuming public's perception of the trademark. Second, the cases reveal that the Ninth Circuit views the uncorroborated opinions of interested affiliates with distrust—even at the summary judgment stage.[10] *See* 2 McCarthy § 15:40 at 15–61 ("Conclusory testimony by employees as to the probable mental reactions of buyers is often merely self-serving evidence given to satisfy the employer."). Although such affidavits may satisfy the lenient standard for relevance under Rule 401 of the Federal Rules of Evidence, they carry minimal probative weight and cannot defeat summary judgment.

Here, Buchner and Rowe admit that they have maintained close affiliation with Continental for more than five years. Buchner's affidavit admits that he has con-

sulted for Continental since 1994 on issues related to product development. (Buchner Decl. ¶ 1.) Buchner does not explain how he first learned of the existence and design of Continental's product, nor does he attempt to connect his claimed "association" with any of Continental's promotional or advertising efforts. Given his lengthy relationship with Continental and the vague, conclusory and uncorroborated nature of his affidavit, Buchner's statements carry little evidentiary weight in determining whether the design of the card-holding container achieved secondary meaning. *Filipino Yellow Pages*, 198 F.3d at 1151.

Continental's other affiant, Rowe, provides more detail yet also fails to raise a genuine issue of material fact. Rowe admits that he has worked as Technical Director for Continental since September 1994. (Rowe Decl. ¶ 1.) He claims to have first discovered the Continental product while working for a company he founded with two other scientists. (*Id.*) Rowe alleges that he learned of the Continental product's allegedly distinctive design while surveying local and national manufacturers of scientific products in November 1992. (*Id.* ¶ 2.) Rowe states that he knew at that time that the Continental product was the only pipette tip reload system available, and that it used a card-holding container with a unique "double-V" slot design. (*Id.*) Considering his admitted five-year employment with Continental, however, Rowe's

---

9. Continental provided an affidavit remarkably similar to the one criticized by the Ninth Circuit in *Filipino Yellow Pages*. Specifically, the affidavit of Mr. White, Continental's president, describes logging onto Medax's Internet web site in late 1996, discovering Defendants' TRANSAX product, and believing it was a Continental product. (White Decl. ¶¶ 11, 12.) He states: "If I, the designer and manufacturer of the ESP packaging system, can be confused, it must be very confusing to our customers." (*Id.* ¶ 13.)

10. Similarly, federal courts outside the Ninth Circuit have refused to give probative weight to an affidavit provided by the trademark holder. *Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1270 (7th Cir.1989) ("A party's subjective, self-serving view of its own

alleged trademark is not competent evidence on which to base a finding of secondary meaning."); *Co–Rect Prods., Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324, 1332 (8th Cir.1985) ("[D]esires or intentions of the creator ... are irrelevant. Instead, it is the attitude of the consumer that is important."); *Seabrook Foods, Inc. v. Bar–Well Foods Ltd.*, 568 F.2d 1342, 1345 (C.C.P.A.1977) ("[R]egardless of the [mark owner's] intentions, it is the association, by the consumer, of the ... design with the [mark owner] as the source that is determinative."); *Plastilite Corp. v. Kassnar Imports*, 508 F.2d 824, 827 (C.C.P.A. 1975) (holding that in determining distinctiveness, "it is the association of the mark with a particular source by the ultimate consumers which is to be measured-not [applicant's] intent" in adopting the mark).

opinion hardly reflects the views of consumers. *Self–Realization Fellowship Church*, 59 F.3d at 910.

■ One final point requires only brief comment. Although Continental did not cite *Self–Realization Fellowship Church* in any of its briefs, its arguments clearly reflect awareness of the principle articulated in that decision. Attempting to portray the affidavits as something more than unreliable and biased attestations from longtime affiliates, Continental emphasizes that Buchner and Rowe "associated" the cardholding container design *prior* to their relationship with Continental. More specifically, Rowe states that he first associated the design of the card-holding container with Continental in November 1992, almost two years before he accepted employment with Continental. (Rowe Decl. ¶ 2.) Buchner claims to have associated the card-holding container design with Continental "since November 1993," before he started working as a Continental consultant in "approximately 1994." (Buchner Decl. ¶¶ 1, 2.)

The Court doubts that an affiant can evade *Self–Realization Fellowship Church* by merely rolling back his claimed date of "association" to a date before the affiliation with the trademark holder, without providing any corroborating evidence or detail to support allegiance to the earlier date. Assuming the truth of the Buchner and Rowe affidavits for purposes of summary judgment, however, they nonetheless fail to raise a genuine issue of material fact.

Rowe claims to have formed an "association" in November 1992—a mere *three months* after Continental introduced its product. Continental has offered no evidence that, during the short period between August and November 1992, it engaged in advertising or promotional efforts or that it achieved anything beyond paltry sales. Similarly, Buchner claims to have formed an association in November 1993— 15 months after product introduction. Continental provides only a raw revenue figure of "$704,809" for 1993, with no estimate of the number of units sold or the approximate number of distinct customers. (Trout Decl.Ex. B.) [11] As discussed above, Continental made only trivial efforts to advertise and promote its product, and does not contend that it distributed its product catalogs between 1992 and 1993. In sum, Continental's anemic promotional efforts during this period and its incomplete sales evidence lead to only one rational conclusion: secondary meaning could not have existed at the time these affiants formed their alleged "association." [12] Any connection Rowe and Buchner formed between the card-holding container design and Continental did not reflect an association that existed in the minds of the consuming public.

**v. *Secondary Meaning—Synthesis***

After two-and-a-half years of litigation, extensive discovery, multiple depositions and three separate pretrial motions directed at its trade dress claims, Continental

---

11. The Court has estimated the number of units sold for 1993 as 35,240, based on the revenue and per-unit costs reflected between 1995–1998. *See infra* footnote 7.

12. Although no mechanical rules exist for determining whether secondary meaning can attach in a given period of time, many courts have rejected claims of secondary meaning based on similarly short periods of time. *See, e.g., Braun,* 975 F.2d at 826 (reversing jury verdict of trade dress infringement in part because plaintiff's blender design had only 18 months to attain secondary meaning, noting: "[W]hile not impossible, it is difficult for a product to acquire secondary meaning during an 18–month period."); *Cicena,* 900 F.2d 1546 (Fed.Cir.1990) (same; no secondary meaning where plaintiff's trade dress was on market for only 18 months); *Co–Rect Products, Inc. v. Marvy! Advertising Photography, Inc.,* 780 F.2d 1324, 1332 (8th Cir.1985) (affirming summary judgment for defendant; no secondary meaning where plaintiff used trademark for only 10 months before defendant began infringing); *Burke–Parsons–Bowlby Corp. v. Appalachian Log Homes, Inc.,* 871 F.2d 590, 595–96 (6th Cir.1989) (affirming cancellation of registered trademark largely because mark had only 20 months to attain secondary meaning). The plaintiffs in each of these cases presented significantly more evidence of secondary meaning than Continental offers here.

offers little more than speculation and conjecture to support secondary meaning. Despite ample opportunity and resources, Continental offers no direct evidence of secondary meaning, such as consumer surveys or testimony. Continental's circumstantial evidence, as detailed above, amounts to paltry and vaguely described promotional efforts, incomplete and ambiguous sales data and affidavits from two individuals who have maintained close affiliation with Continental for more than five years. Continental's period of exclusive use, the only fact arguably supporting its claim of secondary meaning, has little significance in light of the deficiencies that plague the other evidence.

Viewing the record in the light most favorable to Continental, a reasonable jury could not infer secondary meaning from these facts without bridging Continental's evidentiary gaps with speculation and conjecture—an impermissible practice incapable of precluding summary judgment. *Nelson v. Pima Community College*, 83 F.2d 1075, 1081–82 (9th Cir.1996); *Neely v. St. Paul Fire and Marine Ins. Co.*, 584 F.2d 341, 346 (9th Cir.1978) (summary judgment properly granted against plaintiff where trier of fact would have to rely "upon surmise and speculation."). Indeed, federal decisions have rejected claims of secondary meaning by plaintiffs who provided considerably more circumstantial evidence than Continental presents here. *See, e.g., Braun, Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 826–27 (Fed.Cir.1992) (reversing jury verdict); *Mana Products, Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1071 (2d Cir.1995) (affirming summary judgment); *Echo Travel, Inc. v. Travel Associates, Inc.*, 870 F.2d 1264 (7th Cir.1989) (affirming summary judgment); *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863 (8th Cir.1994) (reversing district court findings); *Al–Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308, 1327 (Fed.Cir. 1999) (reversing jury verdict); *Investacorp, Inc. v. Arabian Investment Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519 (11th Cir.1991) (affirming summary judgment).

### vi. Intentional Copying

Having determined that Continental has offered no probative evidence independently showing secondary meaning, the Court now turns to what Continental presents as its evidentiary centerpiece: deliberate copying. Continental contends that Defendants intentionally copied the design of the esp® card-holding container, which supports an inference of secondary meaning.

■ In the Ninth Circuit, evidence of deliberate copying may, in appropriate cases, raise an inference of secondary meaning but does not raise an evidentiary presumption or shift the burden of proof to the defendant. *Fuddruckers*, 826 F.2d at 844–45. The rule derives from the assumption that a defendant would not copy a mark or design unless it (1) believed the mark or design had attained secondary meaning in the minds of consumers, and (2) intended to exploit this secondary meaning to deceive consumers. *See, e.g., M. Kramer Mfg. Co., Inc. v. Andrews*, 783 F.2d 421, 449 (4th Cir.1986) ("[W]hen a defendant copies the trademark of a competitor, it is likely that he intended to appropriate some commercial advantage or benefit that his competitor derived from the use of the mark."); *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.*, 781 F.2d 604, 611 (7th Cir.1986) (dicta) ("If the defendant thinks that the plaintiff's trade dress has acquired secondary meaning, so that he can confuse consumers by adopting the same or a confusingly similar trade dress for his own brand, this is some indication that it has acquired secondary meaning."); *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir. 1960) ("There is no logical reason for precise copying save an attempt to realize upon a secondary meaning that is in existence.") (applying California law). In essence, copying operates as a concession that the defendant believes the plaintiff's mark or design has secondary meaning, which in turn proves that it does.

■ Neither the Ninth Circuit nor the Supreme Court has addressed the evidentiary relationship between intentional copying and secondary meaning in a trade dress case based entirely on product design. The Supreme Court has recently made clear, however, that product design cases trigger considerations and policies that do not arise in cases involving word marks and product packaging, which can affect the legal requirements for distinctiveness. *See Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, ——, 120 S.Ct. 1339, 1344–45, 146 L.Ed.2d 182 (2000) (eliminating availability of inherent distinctiveness for product designs; rejecting suggestion that nonfunctionality requirement adequately protects trademark law from chilling legitimate competition). Thus, applying the deliberate copying rule to product designs mandates a reassessment of its effectiveness.[13]

Most of the cases that have given weight to copying have done so without scrutiny or analysis. To derive secondary meaning from deliberate copying, the court must forge a circular chain of inferences: (1) the plaintiff's product mark or design has secondary meaning; (2) the defendant knew about this secondary meaning; (3) the defendant copied the mark or design to exploit this secondary meaning and confuse consumers; and (4) thus the mark or design has secondary meaning. As discussed below, the factual assumptions incorporated into each step of this inferential chain do not apply to many product design cases, including this one.

The first and second assumptions require a court to assume the plaintiff's product has secondary meaning—the fact the plaintiff bears the burden of proving. *See* Timothy Bryant, Comment, *Trade-mark Infringement: The Irrelevance of Evidence of Copying to Secondary Meaning,* 83 N.W.U.L.Rev. 473 (1989) (observing inherent circularity behind use of intentional copying as evidence of secondary meaning). ˝ Both assumptions collapse where, as here, the plaintiff offers no independent evidence of secondary meaning. As described above, Continental has no direct or probative circumstantial evidence of secondary meaning. This failure of proof reduces any inference of Defendants' knowledge into tenuous, if not irrational, conjecture. After all, how could Defendants have known of a secondary meaning that, based on the undisputed evidence, never existed? *See Chrysler Corp. v. Vanzant,* 44 F.Supp.2d 1062, 1083 (C.D.Cal. 1999) (refusing to infer secondary meaning from admitted intentional copying in part because plaintiff produced no probative independent evidence of secondary meaning); *cf. Blau Plumbing,* 781 F.2d at 611 ("[T]he state of mind of an alleged trademark infringer is more relevant to deciding whether consumers are likely to be confused than whether the trademark is valid ... That question doesn't arise unless the trademark is valid; this trademark is not.") (citation omitted); *Atlantis Silverworks, Inc. v. 7th Sense, Inc.,* 42 U.S.P.Q.2d (BNA) 1904, 1909 (S.D.N.Y. 1997) ("[I]t is axiomatic that evidence of copying is irrelevant if the trade dress is not protectable.") (citation omitted).

Federal courts have repudiated the third assumption described above, that "[t]here is no logical reason for precise copying save an attempt to realize upon a secondary meaning that is in existence." *Audio Fidelity,* 283 F.2d at 558. More recent decisions have recognized that reasons unrelated to the exploitation of existing sec-

---

**13.** The defendant's intent has a firmly established role as evidence of likely confusion. Where the plaintiff shows that the defendant copied with the intent to confuse consumers, "the inference of likelihood of confusion is readily drawn, [...] because the alleged infringer has indicated by his actions an expectation that such confusion will indeed be created." *HMH Pub. Co., Inc. v. Brincat,* 504 F.2d 713, 720 (9th Cir.1974); *American Chicle Co. v. Topps Chewing Gum, Inc.,* 208 F.2d 560, 562–63 (2d Cir.1953) (L.Hand). The Court need not address the applicability of this rule to product design cases; Continental's failure to show that its trade dress has secondary meaning renders consideration of likely confusion superfluous. *See Blau Plumbing,* 781 F.2d at 611.

ondary meaning often drive a competitor to closely copy a mark or design. As stated by the Eleventh Circuit, "close copying does not necessarily indicate that the defendant has attempted to capitalize on the secondary meaning of plaintiff's trademark or trade dress because there may have been many other motivations for defendant's actions." *Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.*, 716 F.2d 854, 859–60 (11th Cir.1983) (quotations omitted; citation omitted). For example, a defendant may deliberately copy a descriptive mark because it accurately and succinctly describes the properties of the defendant's goods or services. *See, e.g., Blau Plumbing*, 781 F.2d at 611; *Philip Morris, Inc. v. R. J. Reynolds Tobacco Co.*, 188 U.S.P.Q. (BNA) 289, 293–94, 1975 WL 21170 (S.D.N.Y.1975) (no secondary meaning or likely confusion inferred from copying the term "Lights" because defendant copied the term to accurately describe the reduced tar and nicotine content of its cigarettes).

In the trade dress context, the Ninth Circuit recognized this principle by refusing to presume secondary meaning from evidence of deliberate copying. *Fuddruckers*, 826 F.2d at 844–45 (product packaging). The court recognized that "[c]ompetitors may intentionally copy product features for a variety of reasons," and "may, for example, choose to copy wholly functional features that they perceive as lacking any secondary meaning because of those features' intrinsic economic benefits." *Id.; see also Cicena*, 900 F.2d at 1552 (same; product design). A competitor may copy a product design or feature to exploit public demand, and have no knowledge of a secondary meaning and no intention of deceiving consumers. *Duraco Prods.*, 40 F.3d at 1453 ("[A]ttempts

to copy a product configuration will quite often not be probative [of secondary meaning]: the copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product."); *Aromatique*, 28 F.3d at 871 ("Where there is a demand for a type of product, capitalizing on that demand by copying that product does not necessarily indicate that the original product has secondary meaning."). Because of these alternative explanations, many courts have refused to infer secondary meaning from mere intentional copying. Instead, intentional copying supports a finding of secondary meaning only where the defendant intended to confuse consumers and pass off its product as the plaintiff's. *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 663 (7th Cir.1995); *Blau Plumbing*, 781 F.2d at 611; *Chrysler*, 44 F.Supp.2d at 1083. "In that situation, the defendant's belief that plaintiff's trade dress has acquired secondary meaning—so that his copying will indeed facilitate his passing off—is some evidence that the trade dress actually has acquired secondary meaning." *Thomas & Betts*, 65 F.3d at 663.[14]

Here, Defendants do not deny that they intentionally copied Continental's product design, and indeed, the similarities in appearance and function between the parties' products would easily support such a conclusion. Defendants acknowledge that they considered various pipette tip systems on the market before they introduced their TRANSAX product, including the Continental product. (Decl. of Kathleen Pasulka ("Pasulka Decl."), Ex. 9 at 14–15.) However, as in many product design cases where the plaintiff makes a weak or nonextant showing of secondary meaning, the

**14.** As a related principle, federal courts have refused to infer secondary meaning from deliberate copying of a product design where the defendant uses a different packaging design or conspicuously displays its own trademarks. *Aromatique*, 28 F.3d at 871; *Remco Indus., Inc. v. Toyomenka, Inc.*, 286 F.Supp. 948, 955 (S.D.N.Y.1968), *aff'd.* 397 F.2d 977 (2d Cir.1968); *cf. Versa Prods. Co. v. Bifold

Co.*, 50 F.3d 189, 207–08 (3d Cir.1995) (intentional copying carries no weight in determining likelihood of confusion in product configuration cases unless infringer uses affirmatively misleading labeling or marketing). The principle behind these cases is that a court should not infer that the defendant intended to deceive consumers where it made deliberate efforts to prevent source confusion.

evidence points to only one rational conclusion—Defendants copied the design for functional reasons. Defendants explain that the two-stack design of the Continental card-holding container, with its V-shaped side slots, permits the storage of approximately 1000 pipette tips, provides stability for the stacked cards and allows the user's fingers easy access to each row in the card stack. (Third Aff. of Jessop ¶ 14; Pasulka Decl. Ex. 10 at 32.) Defendants' advertising and promotional materials, moreover, emphasize the same functional advantages touted by Continental, including increased storage efficiency, lower cost and reduced environmental waste. (Defs.' Ex. 16 at 118; Pasulka Decl. Ex. 15 at 83–87.) This evidence indicates that Defendants sought merely to copy a design they perceived as functionally superior. *See Fuddruckers,* 826 F.2d at 844–45.

Continental responds that Defendants could have relied on alternative designs, including several competing pipette products in the market and three hypothetical designs, and therefore did not need to copy the Continental design to compete. While the existence of alternative designs may show that Defendants intentionally copied a specific design (which they do not deny), it does not necessarily suggest an intent to exploit an existing secondary meaning. The relevance of deliberate copying turns on Defendants' intent—not on whether the design they copied is legally functional. As with most product design cases, Continental cannot point to a limitless number of equally competitive alternatives to raise an inference of bad faith. The existence of several alternative designs does not undermine Defendants' belief that the Continental design represented the best of the alternatives they considered.[15]

Continental next claims the Court may infer an intent to deceive because Defendants sent photographs of their allegedly infringing product to several distributors for use in their own advertising.[16] However, the photographs merely show the components of Defendants' pipette tip system, and are entirely consistent with a desire to reveal the product's characteristics to consumers. *Blau Plumbing,* 781 F.2d at 611. The neutral act of sending a photograph to distributors implies neither an intent to deceive nor an awareness that the item displayed has secondary meaning. In sum, Continental has no evidence that Defendants intended to deceive or confuse consumers.

The final assumption identified above—that the defendant's belief that plaintiff's mark or design has secondary meaning somehow proves that it does—completes the circle and reveals a flaw more fundamental than the assumption that deliberate copying automatically establishes an intent to deceive. As discussed previously, secondary meaning exists when, in the minds of the public, the primary significance of a mark or design is to identify the source of the product and not the product itself. *Inwood Labs.,* 456 U.S. at 851 n. 11, 102 S.Ct. at 2187 n. 11. "An evidentiary showing of secondary meaning ... includes evidence of the trademark owner's method of using the mark, supplemented by evidence of the effectiveness of such use to cause the purchasing public to identify the mark with the source of the product." *In re Owens–Corning Fiberglas Corp.,* 774 F.2d 1116, 1125 (Fed.Cir.1985). Thus, courts rely on evidence that tends to show that such a consumer association actually exists—such as customer surveys and testimony, unsolicited media coverage, adver-

---

**15.** This observation clearly applies here. As discussed in the section on nonfunctionality, *infra,* Continental has no evidence that any of its alleged alternatives offers the functional benefits of the Continental design. Indeed, many of Continental's alleged alternatives are competing pipette tip products Defendants' advertising criticizes as functionally inferior.

At least one of the competing alternative products Continental identifies appears to implement the prior art identified in Continental's patent specification.

**16.** Continental does not assert a Lanham Act false advertising claim based on Defendants' use of these alleged photographs.

tising and sales. The defendant's beliefs or intentions bear no resemblance to any of these categories of evidence, and the Court cannot locate any decision that describes how a defendant's subjective intentions or beliefs have any rational evidentiary nexus to consumer perceptions. *See* Bryant, *supra* at 486.

For example, it is well-established that the opinions of those closely affiliated with the plaintiff, such as employees, carry almost no probative weight in the secondary meaning calculus because they do not generally reflect the views of consumers. *Self–Realization Fellowship Church*, 59 F.3d at 910–12. Why would the opinion of a defendant, possessing intricate understanding of the market in which it operates and a detailed knowledge of its competitors' offerings, have any greater reliability as an assessment of consumer views? Unless the defendant based its opinion on its own consumer surveys or research (or other evidence which would be discoverable and independently probative of secondary meaning), the defendant's opinion may not serve as any more reliable a yardstick to measure consumer perceptions than the plaintiff's. A defendant's beliefs or intentions carry probative weight, at best, equal to the opinions of a single consumer, and at worst, the subjective opinion of the plaintiff and its employees. Regardless of where the copying defendant's opinion falls on this continuum, a single opinion from any viewpoint does not possess sufficient probative value to defeat summary judgment. *Filipino Yellow Pages*, 198 F.3d at 1151; *Self–Realization Fellowship Church*, 59 F.3d at 910; *Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1071 (2d Cir.1995).

For example, Defendant Jessop, before he joined Medax, spent several years managing a business that manufactured and sold pipette tips. (Third Aff. of Jessop ¶ 14.) Based on his understanding of the products available in that market, Jessop clearly could have recognized the design of the esp® pipette system as a Continental product, and may have believed that the public shared this association—even though the evidence detailed above establishes otherwise. Even assuming Jessop believed Continental's product had secondary meaning, absent a factual foundation for such an opinion (which is not in evidence here), it carries minimal probative weight and possibly amounts to inadmissible speculation. *Cf. Coca–Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1254–55 (9th Cir.1982) (opinions of defendant's employees held inadmissible to prove consumer perceptions of plaintiff's trademark).

Considering the tenuous evidentiary connection between intentional copying and the views of consumers, and the unique policy considerations that arise in product design trade dress cases, the Court declines to give any weight to Defendants' copying. Many of the decisions that have inferred secondary meaning from copying have implicitly acknowledged the rule's punitive, rather than evidentiary, purposes. *Cf. Norwich Pharmacal Co. v. Sterling Drug, Inc.*, 271 F.2d 569, 570–71 (2d Cir.1959) ("Distaste for sharp or unethical business practices has often caused the courts to lose sight of the fundamental consideration in the law of unfair competition—protection of the public."). The rule distracts the trier of fact from the highly relevant evidence relating to the effectiveness of plaintiff's efforts to create secondary meaning, and invites a meaningless inquiry into whether the defendant can provide a morally acceptable reason for copying the plaintiff's design. Here, Continental has repeatedly attempted to obscure its failure to prove secondary meaning by accusing Defendants of "stealing" the Continental product design to "lure away" customers. The rule Continental advances would effectively permit the trier of fact to confer trademark rights on a plaintiff based on nothing more than its perception of the defendant's moral culpability. A defendant's conduct, whether legitimate or reprehensible, has only a tenuous connection to the perceptions of consumers and should not relieve a plaintiff of its burden of showing that it has successfully imbued its design with sec-

ondary meaning. Bestowing legal and evidentiary significance on intentional copying will result in inconsistent outcomes in suits involving the same product design, and create legal uncertainty that could chill legitimate competition.

Finally, placing evidentiary weight on intentional copying serves no Lanham Act policy where, as here, the plaintiff's product design has no secondary meaning. As the leading trademark treatise notes, "if a senior user has not obtained secondary meaning in a non-inherently distinctive mark, then another's use of that mark cannot result in buyer confusion, for buyers do not associate the mark only with the senior user." *See* 2 McCarthy, *supra,* § 15:11; *Wal Mart Stores,* 529 U.S. at ——, 120 S.Ct. at 1343 (noting that confusion cannot occur in the absence of distinctiveness or secondary meaning). In other words, absent secondary meaning, Defendants' duplication and sale of Continental's product design, and conspicuous display of that design in its own promotional materials, will not create source confusion. Even if Defendants attempted to deceive the public, Continental's failure to create secondary meaning ensures that such efforts could never succeed.

For the foregoing reasons, the Court holds that Defendants' copying of Continental's product design does not provide independent evidence of secondary meaning, and cannot overcome summary judgment.

### D. NONFUNCTIONALITY

Although the Court has concluded that Continental cannot show that the design of its card-holding container has attained secondary meaning or qualifies as inherently distinctive product packaging, the Court also finds merit to Defendants' alternate argument that Continental cannot produce evidence of nonfunctionality.

#### 1. LEGAL STANDARD—NONFUNCTIONALITY

A product feature is functional and "cannot serve as a trademark 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Prods., Co.,* 514 U.S. 159, 165, 115 S.Ct. 1300, 1304, 131 L.Ed.2d 248 (1995) (quoting *Inwood Lab.,* 456 U.S. at 850 n. 10, 102 S.Ct. at 2186 n. 10). Nonfunctionality turns on an evaluation of several factors, including: (1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design and (4) whether a particular design results from a comparatively simple or inexpensive method of manufacture. *Disc Golf Ass'n,* 158 F.3d at 1006. The Federal Circuit has held that the mere existence of a utility patent that discloses an allegedly distinctive product design does not render the design ineligible for protection under the Lanham Act. *Midwest Indus., Inc. v. Karavan Trailers, Inc.,* 175 F.3d 1356, 1362–63 (Fed.Cir.1999).[17]

The burden of proving nonfunctionality falls on the trade dress plaintiff. *Rachel v. Banana Republic, Inc.,* 831 F.2d 1503, 1506 (9th Cir.1987). Thus, when a plaintiff fails to produce evidence such that a reasonable trier of fact could find the design

---

**17.** Defendants correctly observe that the Federal Circuit and the Ninth Circuit do not precisely agree on the legal significance of statements in a utility patent for determining trade dress functionality. *Compare Disc Golf Ass'n,* 158 F.3d at 1006 (9th Cir.) (asserting that the existence of a utility patent disclosing the allegedly protected product configuration "is weighty evidence of functionality, although that fact alone is not dispositive.") *with Midwest Indus.,* 175 F.3d at 1362–63 (Fed.Cir.) (acknowledging that "statements in

a patent may provide evidence that the asserted trade dress is functional," but warning that "the fact that a patent has been acquired does not convert what otherwise would have been protected trade dress into nonprotected matter."). The Court finds the slight differences between the two legal standards irrelevant to the disposition of this motion; Continental cannot show nonfunctionality even if the Court ignores every statement in the '482 Patent, all of which weigh against Continental.

nonfunctional, the district court must enter summary judgment in favor of the defendant. *Disc Golf Ass'n*, 158 F.3d at 1009–10; *HWE, Inc. v. JB Research, Inc.*, 993 F.2d 694 (9th Cir.1993).

The nonfunctionality requirement serves two important policies. First, the rule promotes competition by preventing trade dress law from removing useful product shapes and features from the public domain. *Qualitex*, 514 U.S. at 164–65, 115 S.Ct. at 1304; *Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1012 (9th Cir.1999). Second, the rule avoids conflicts with patent law by precluding trademark law from perpetually protecting a product's utilitarian features. *Qualitex*, 514 U.S. at 164–65, 115 S.Ct. at 1304; 1 McCarthy, *supra*, § 6:64 (arguing that affording trademark protection to useful product features effectively eviscerates the strict limitations and requirements for protection of useful inventions under the Patent Act).

### 2. DISCUSSION

Defendants identify several functions served by Continental's card-holding container, including: (1) holding approximately 1,000 pipette tips in a nested arrangement before use and (2) permitting the user's fingers to access each holder card in the stack. (Defs.' Mot. at 17–18; Third Aff. of Paul Jessop ¶ 14.) Defendants contend the design of the container and its V-shaped side slots enables both of these essential purposes, and is therefore functional.

Because Continental bears the burden of proof on the issue of nonfunctionality, the Court must determine whether Continental has presented sufficient evidence to overcome summary judgment. Continental offers no evidence nor directs any argument as to whether its advertising promotes the utilitarian advantages of the design or whether the design results from a comparatively simple or inexpensive method of manufacture. Rather, Continental contends that several feasible alternative designs exist, demonstrating that Defendants did not need to copy the Continental design to compete. (Pl.'s Opp'n at 13–14.) Continental relies exclusively on an affidavit from its expert witness, Richard P. Meyst, who analyzes five competitive products and offers three hypothetical alternative designs. Meyst claims that Defendants could compete effectively in the pipette tip market without copying.

Although a plaintiff may rely on evidence of alternative designs to show nonfunctionality, the alternatives it identifies "must be more than merely theoretical or speculative ... The court must find that 'commercially feasible alternative configurations *exist*.'" *Disc Golf Ass'n*, 158 F.3d at 1008 (quoting *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1531 (9th Cir. 1992)) (emphasis in *Sega*); 1 McCarthy, *supra*, § 7:75 ("To be probative of nonfunctionality, alternative designs must be practical, feasible and effective.").[18] In addition, a sufficient *number* of alternative designs must exist such that providing trademark protection to one design will not hinder competition. *Disc Golf Ass'n*, 158 F.3d at 1008; *In re Lincoln Diagnostics, Inc.*, 30 U.S.P.Q.2d (BNA) 1817, 1824–25, 1994 WL 262247 (1994) (suggesting that permitting trademark applicant to

---

**18.** Defendants argue that Continental may not introduce hypothetical alternative designs because those designs were never produced or offered for sale. However, many courts have permitted a trade dress plaintiff to rely on hypothetical alternatives as evidence of nonfunctionality. *Clamp Mfg.*, 870 F.2d at 516–17 (9th Cir.) (affirming finding of nonfunctionality based in part on evidence of hypothetical alternative designs); *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 299 (7th Cir.1998) ("There is no requirement that the alternative shapes must have been successfully marketed in order to show that effective competition is possible[.]"). The Ninth Circuit's admonition against "theoretical or speculative" alternative designs does not preclude a plaintiff from relying on hypothetical alternatives. So long as the plaintiff offers evidence that its hypothetical alternatives would possess competitive characteristics (i.e. cost, quality, and usability), the design is not "theoretical or speculative."

monopolize one design would impermissibly hinder competition notwithstanding existence of seven alternatives).

Having carefully considered the Meyst affidavit, the Court finds that it fails to raise a genuine issue regarding the competitiveness of the identified commercial or hypothetical alternatives. First, Meyst identifies five commercially available pipette products that compete with the Continental product: Earthstak, Corning Costar, VWR Scientific, Greiner EasyLoad and Rainin. (*See* Meyst Decl. ¶¶ 21–25, Exs. 8–12.) Continental contends these five competing products demonstrate the nonfunctionality of the Continental design.

The Court need not determine whether five commercially available alternatives can defeat summary judgment because Continental offers no evidence as to the competitiveness of any of them. Meyst's affidavit includes single-page advertisements that do not describe how the products operate or how they compare to the Continental design. (*Id.* Exs. 8–12.) Meyst admits that, with the exception of Rainin, he did not physically examine these other products; in fact, his affidavit merely repeats the sparse information contained in the advertisements. (*Id.* ¶¶ 20–25.) Meyst "has provided no sales data for [the] alternative designs and no information pertaining to the market share for any particular alternative design." *Disc Golf Ass'n,* 158 F.3d at 1009. He offers no pricing data for the Corning Costar, VWR Scientific, Easyload or Rainin products, nor does he even allege that these products are priced competitively with the Continental product. He offers no evidence nor even alleges that any of these alternatives can match the Continental design in terms of ease-of-use, storage efficiency, amount of environmental waste produced and per-unit cost of production.[19] The complexity and intricacy of these alleged alternatives, moreover, precludes the

Court from drawing inferences solely from their product photographs. In sum, the sparseness of this evidence would not permit a reasonable jury to even begin to assess the competitiveness of these products. *See Leatherman Tool Group,* 199 F.3d at 1013–14 & 1014 n. 7 (existence of competing products in the marketplace not probative of nonfunctionality where the products do not offer features and advantages equivalent to plaintiff's design).

Second, Meyst offers three hypothetical container designs for use with the Continental and Medax products. (Meyst Decl. ¶¶ 10–19.) Unlike the Continental and Medax designs that employ V-shaped side slots and end walls, Meyst's hypothetical alternatives eliminate the side slots entirely, leave one side open and require the user to remove the pipette tip holder cards from the side rather than the top. These designs include: (1) a single stack of five cards, (2) a single stack of ten cards, and (3) two side-by-side stacks of five cards. (Meyst Decl. Exs. 5–7.) Meyst explains that these hypothetical designs would require approximately the same amount of cardboard as Continental container, cost the same, have equal structural strength and comparable product quality. (*Id.* ¶ 14.)

Although Continental may offer hypothetical designs to show nonfunctionality, Meyst has failed to explain how one would use these alleged alternatives in the context of the Continental or Medax products. Meyst offers only one sentence purporting to explain how one would use these alleged alternatives: "Access to the product is straightforward and easy." (*Id.* ¶ 10.) Meyst does not explain how the user's fingers can access the pipette tips with the card transfer device employed by the Continental and Medax products. He does not compare these hypothetical alternatives to the Continental design in terms of purpose or use.[20]

---

19. In fact, Defendants' advertising brochure criticizes several of these alleged alternatives on the ground that they produce more solid

waste and operate only with specific proprietary racking systems. (Defs.' Ex. 16.)

20. In its Order denying Defendants' previous

All three designs, moreover, share glaring functional flaws. The hypothetical design that employs a single stack of five cards has only half the card-holding capacity of the Continental container. The design that uses a single stack of 10 cards was specifically considered and rejected by Defendants as "too unstable," meaning it could tip over too easily. (Pasulka Decl., Ex. 10 at 32.) Meyst does not contradict this assertion. Moreover, removing the center slots and side walls undermines the effectiveness of the product in two ways. First, the hypothetical designs do not permit the user's fingers to access the center of the pipette tip holder card, nor do they provide any reasonable access for the bottom cards. (Meyst Decl. Exs. 5–7.) As discussed above and in the Court's previous orders, the Continental and Medax products require the user to attach a card transfer device to the top pipette tip holder card and carry the transfer device using the user's thumb and forefinger. Meyst does not explain how a user can accomplish this task without grasping and holding the pipette holder card and transfer device from its center, which is impossible with the three hypothetical designs. Second, because all three alternatives have open sides, nothing prevents the stacked and nested pipette tip cards from slipping or tipping out of the container, particularly during card transfer. In sum, Meyst's hypothetical alternatives actually uncover the essential functional characteristics of the Continental design.[21]

For these reasons, the Court concludes that Continental has failed to provide evidence such that a reasonable jury could find the design of the card-holding container nonfunctional.[22]

## IV. CONCLUSION

For the foregoing reasons, Defendants are entitled to summary judgment as against Continental's claims for trade dress infringement and unfair competition.

---

motion for summary judgment, the Court rejected Defendants' argument that granting Continental trade dress rights over the design of the card-holding container, with its V-shaped side slots, would hinder competition. The Court reasoned:

> The only function served by the cutouts is to facilitate easy access to the top pipette holder card in the stack. Countless alternative cutout designs could have served this purpose. Defendants could have employed a "U" shaped cut-out, a cutout with tapered sides, a more rectangular shape, or could have widened the angle of the "V"—all with *de minimus* impact on the ability of a user to retrieve the holder cards or to otherwise use the tip packaging system.

(*See Order Denying Defendants' Motion for Summary Judgment* at 12:10–16.) Since the issuance of that Order, however, Continental has broadened the definition of its trade dress such that all of the alternatives identified by the Court would infringe. Indeed, since commencement of this litigation Defendants have replaced the "V" shaped slot design on TRANSAX with a "U" shaped slot design. (Defs.' Exs. 12, 31.) Despite the obvious visual differences between the design of Continental's pipette product and the "U" shaped slot design now used by TRANSAX, Continental continues to assert that Defendants' recent product infringes its trade dress. (*See* Pl.'s Opp'n at 17–18.) As discussed in the text, by expanding the definition of its trade dress to envelop every one of Defendants' products (and any possible side slot design), Continental doomed its trade dress claim by establishing its inability to show nonfunctionality.

21. Continental further complains that Defendants copied the way in which the Continental product includes directions on the side of the card-holding container. (White Decl. ¶ 19.) According to Continental: "There are a number of alternatives to this design choice including putting these directions on the inside of the outer box cover, on the outside of the outer box cover, or on a separate directions sheet." (*Id.*) This argument lacks merit; placing directions on the product has obvious advantages over including them on packaging or a separate card, which may be lost, discarded or separated.

22. Having found that Continental cannot show two essential elements of trade dress infringement (distinctiveness or nonfunctionality), the Court need not reach the parties' remaining arguments pertaining to likelihood of confusion.