# WAL-MART STORES, INC. *v.* SAMARA BROTHERS, INC.

No. 99–150.  Argued January 19, 2000—Decided March 22, 2000

Scalia, J., delivered the opinion for a unanimous Court.

*William D. Coston* argued the cause for petitioner. With him on the briefs were *Kenneth C. Bass III* and *Martin L. Saad.*

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Waxman, Acting Assistant Attorney General Ogden, Edward C. DuMont, Barbara C. Biddle, Alfred Mollin, Albin F. Drost,* and *Nancy C. Slutter.*

*Stuart M. Riback* argued the cause for respondent. With him on the brief was *Mark I. Levy.**

JUSTICE SCALIA delivered the opinion of the Court.

In this case, we decide under what circumstances a product's design is distinctive, and therefore protectible, in an action for infringement of unregistered trade dress under § 43(a) of the Trademark Act of 1946 (Lanham Act), 60 Stat. 441, as amended, 15 U. S. C. § 1125(a).

I

Respondent Samara Brothers, Inc., designs and manufactures children's clothing. Its primary product is a line of spring/summer one-piece seersucker outfits decorated with appliqués of hearts, flowers, fruits, and the like. A number of chain stores, including JCPenney, sell this line of clothing under contract with Samara.

Petitioner Wal-Mart Stores, Inc., is one of the Nation's best known retailers, selling among other things children's clothing. In 1995, Wal-Mart contracted with one of its suppliers, Judy-Philippine, Inc., to manufacture a line of children's outfits for sale in the 1996 spring/summer season. Wal-Mart sent Judy-Philippine photographs of a number of garments from Samara's line, on which Judy-Philippine's garments were to be based; Judy-Philippine duly copied, with

*Briefs of *amici curiae* urging reversal were filed for the International Mass Retail Association by *Jeffrey S. Sutton* and *Robert J. Verdisco;* for the Private Label Manufacturers Association by *Arthur M. Handler;* and for Scott P. Zimmerman by *Charles W. Calkins.*

*H. Bartow Farr III, Richard G. Taranto,* and *Stephen M. Trattner* filed a brief for Ashley Furniture Industries, Inc., et al. as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed for the American Intellectual Property Law Association by *Sheldon H. Klein, Michael A. Grow,* and *Louis T. Pirkey;* for the International Trademark Association by *Theodore H. Davis, Jr., Morton D. Goldberg,* and *Marie V. Driscoll;* and for Payless Shoesource, Inc., by *William A. Rudy* and *Robert Kent Sellers.*

only minor modifications, 16 of Samara's garments, many of which contained copyrighted elements. In 1996, Wal-Mart briskly sold the so-called knockoffs, generating more than $1.15 million in gross profits.

In June 1996, a buyer for JCPenney called a representative at Samara to complain that she had seen Samara garments on sale at Wal-Mart for a lower price than JCPenney was allowed to charge under its contract with Samara. The Samara representative told the buyer that Samara did not supply its clothing to Wal-Mart. Their suspicions aroused, however, Samara officials launched an investigation, which disclosed that Wal-Mart and several other major retailers— Kmart, Caldor, Hills, and Goody's—were selling the knockoffs of Samara's outfits produced by Judy-Philippine.

After sending cease-and-desist letters, Samara brought this action in the United States District Court for the Southern District of New York against Wal-Mart, Judy-Philippine, Kmart, Caldor, Hills, and Goody's for copyright infringement under federal law, consumer fraud and unfair competition under New York law, and—most relevant for our purposes— infringement of unregistered trade dress under § 43(a) of the Lanham Act, 15 U. S. C. § 1125(a). All of the defendants except Wal-Mart settled before trial.

After a weeklong trial, the jury found in favor of Samara on all of its claims. Wal-Mart then renewed a motion for judgment as a matter of law, claiming, *inter alia,* that there was insufficient evidence to support a conclusion that Samara's clothing designs could be legally protected as distinctive trade dress for purposes of § 43(a). The District Court denied the motion, 969 F. Supp. 895 (SDNY 1997), and awarded Samara damages, interest, costs, and fees totaling almost $1.6 million, together with injunctive relief, see App. to Pet. for Cert. 56–58. The Second Circuit affirmed the denial of the motion for judgment as a matter of law, 165 F. 3d 120 (1998), and we granted certiorari, 528 U. S. 808 (1999).

## II

The Lanham Act provides for the registration of trademarks, which it defines in § 45 to include "any word, name, symbol, or device, or any combination thereof [used or intended to be used] to identify and distinguish [a producer's] goods . . . from those manufactured or sold by others and to indicate the source of the goods . . . ." 15 U. S. C. § 1127. Registration of a mark under § 2 of the Lanham Act, 15 U. S. C. § 1052, enables the owner to sue an infringer under § 32, 15 U. S. C. § 1114; it also entitles the owner to a presumption that its mark is valid, see § 7(b), 15 U. S. C. § 1057(b), and ordinarily renders the registered mark incontestable after five years of continuous use, see § 15, 15 U. S. C. § 1065. In addition to protecting registered marks, the Lanham Act, in § 43(a), gives a producer a cause of action for the use by any person of "any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods . . . ." 15 U. S. C. § 1125(a). It is the latter provision that is at issue in this case.

The breadth of the definition of marks registrable under § 2, and of the confusion-producing elements recited as actionable by § 43(a), has been held to embrace not just word marks, such as "Nike," and symbol marks, such as Nike's "swoosh" symbol, but also "trade dress"—a category that originally included only the packaging, or "dressing," of a product, but in recent years has been expanded by many Courts of Appeals to encompass the design of a product. See, *e. g., Ashley Furniture Industries, Inc.* v. *Sangiacomo N. A., Ltd.,* 187 F. 3d 363 (CA4 1999) (bedroom furniture); *Knitwaves, Inc.* v. *Lollytogs, Ltd.,* 71 F. 3d 996 (CA2 1995) (sweaters); *Stuart Hall Co., Inc.* v. *Ampad Corp.,* 51 F. 3d 780 (CA8 1995) (notebooks). These courts have assumed, often without discussion, that trade dress constitutes a "symbol" or "device" for purposes of the relevant sections, and we conclude likewise. "Since human beings might use as a 'symbol'

or 'device' almost anything at all that is capable of carrying meaning, this language, read literally, is not restrictive." *Qualitex Co.* v. *Jacobson Products Co.,* 514 U. S. 159, 162 (1995). This reading of § 2 and § 43(a) is buttressed by a recently added subsection of § 43(a), § 43(a)(3), which refers specifically to "civil action[s] for trade dress infringement under this chapter for trade dress not registered on the principal register." 15 U. S. C. § 1125(a)(3) (1994 ed., Supp. V).

The text of § 43(a) provides little guidance as to the circumstances under which unregistered trade dress may be protected. It does require that a producer show that the allegedly infringing feature is not "functional," see § 43 (a)(3), and is likely to cause confusion with the product for which protection is sought, see § 43(a)(1)(A), 15 U. S. C. § 1125(a)(1)(A). Nothing in § 43(a) explicitly requires a producer to show that its trade dress is distinctive, but courts have universally imposed that requirement, since without distinctiveness the trade dress would not "cause confusion . . . as to the origin, sponsorship, or approval of [the] goods," as the section requires. Distinctiveness is, moreover, an explicit prerequisite for registration of trade dress under § 2, and "the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos, Inc.* v. *Taco Cabana, Inc.,* 505 U. S. 763, 768 (1992) (citations omitted).

In evaluating the distinctiveness of a mark under § 2 (and therefore, by analogy, under § 43(a)), courts have held that a mark can be distinctive in one of two ways. First, a mark is inherently distinctive if "[its] intrinsic nature serves to identify a particular source." *Ibid.* In the context of word marks, courts have applied the now-classic test originally formulated by Judge Friendly, in which word marks that are "arbitrary" ("Camel" cigarettes), "fanciful" ("Kodak" film), or "suggestive" ("Tide" laundry detergent) are held to be inher-

ently distinctive. See *Abercrombie & Fitch Co.* v. *Hunting World, Inc.*, 537 F. 2d 4, 10–11 (CA2 1976). Second, a mark has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning, which occurs when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc.* v. *Ives Laboratories, Inc.*, 456 U. S. 844, 851, n. 11 (1982).\*

The judicial differentiation between marks that are inherently distinctive and those that have developed secondary meaning has solid foundation in the statute itself. Section 2 requires that registration be granted to any trademark "by which the goods of the applicant may be distinguished from the goods of others"—subject to various limited exceptions. 15 U. S. C. § 1052. It also provides, again with limited exceptions, that "nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce"—that is, which is not inherently distinctive but has become so only through secondary meaning. § 2(f), 15 U. S. C. § 1052(f). Nothing in § 2, however, demands the conclusion that *every* category of mark necessarily includes some marks "by which the goods of the applicant may be distinguished from the goods of others" *without* secondary meaning—that in every category some marks are inherently distinctive.

Indeed, with respect to at least one category of mark—colors—we have held that no mark can ever be inherently distinctive. See *Qualitex, supra,* at 162–163. In *Qualitex,*

---

\*The phrase "secondary meaning" originally arose in the context of word marks, where it served to distinguish the source-identifying meaning from the ordinary, or "primary," meaning of the word. "Secondary meaning" has since come to refer to the acquired, source-identifying meaning of a nonword mark as well. It is often a misnomer in that context, since nonword marks ordinarily have no "primary" meaning. Clarity might well be served by using the term "acquired meaning" in both the word-mark and the nonword-mark contexts—but in this opinion we follow what has become the conventional terminology.

petitioner manufactured and sold green-gold dry-cleaning press pads. After respondent began selling pads of a similar color, petitioner brought suit under § 43(a), then added a claim under § 32 after obtaining registration for the color of its pads. We held that a color could be protected as a trademark, but only upon a showing of secondary meaning. Reasoning by analogy to the *Abercrombie & Fitch* test developed for word marks, we noted that a product's color is unlike a "fanciful," "arbitrary," or "suggestive" mark, since it does not "almost *automatically* tell a customer that [it] refer[s] to a brand," 514 U. S., at 162–163, and does not "immediately . . . signal a brand or a product 'source,'" *id.*, at 163. However, we noted that, "over time, customers may come to treat a particular color on a product or its packaging . . . as signifying a brand." *Ibid.* Because a color, like a "descriptive" word mark, could eventually "come to indicate a product's origin," we concluded that it could be protected *upon a showing of secondary meaning. Ibid.*

It seems to us that design, like color, is not inherently distinctive. The attribution of inherent distinctiveness to certain categories of word marks and product packaging derives from the fact that the very purpose of attaching a particular word to a product, or encasing it in a distinctive packaging, is most often to identify the source of the product. Although the words and packaging can serve subsidiary functions—a suggestive word mark (such as "Tide" for laundry detergent), for instance, may invoke positive connotations in the consumer's mind, and a garish form of packaging (such as Tide's squat, brightly decorated plastic bottles for its liquid laundry detergent) may attract an otherwise indifferent consumer's attention on a crowded store shelf—their predominant function remains source identification. Consumers are therefore predisposed to regard those symbols as indication of the producer, which is why such symbols "almost *automatically* tell a customer that they refer to a brand," *id.*, at 162–163, and "immediately . . . signal a brand

or a product 'source,'" *id.*, at 163. And where it is not reasonable to assume consumer predisposition to take an affixed word or packaging as indication of source—where, for example, the affixed word is descriptive of the product ("Tasty" bread) or of a geographic origin ("Georgia" peaches)—inherent distinctiveness will not be found. That is why the statute generally excludes, from those word marks that can be registered as inherently distinctive, words that are "merely descriptive" of the goods, § 2(e)(1), 15 U. S. C. § 1052(e)(1), or "primarily geographically descriptive of them," see § 2(e)(2), 15 U. S. C. § 1052(e)(2). In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing.

The fact that product design almost invariably serves purposes other than source identification not only renders inherent distinctiveness problematic; it also renders application of an inherent-distinctiveness principle more harmful to other consumer interests. Consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves by a rule of law that facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness. How easy it is to mount a plausible suit depends, of course, upon the clarity of the test for inherent distinctiveness, and where product design is concerned we have little confidence that a reasonably clear test can be devised. Respondent and the United States as *amicus curiae* urge us to adopt for product design relevant portions of the test formulated by the Court of Customs and Patent Appeals for product packaging in *Seabrook Foods, Inc.* v. *Bar-Well Foods, Ltd.*, 568 F. 2d 1342 (1977). That opinion, in determining the inherent distinctiveness of a product's packaging, considered, among

other things, "whether it was a 'common' basic shape or design, whether it was unique or unusual in a particular field, [and] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods." *Id.*, at 1344 (footnotes omitted). Such a test would rarely provide the basis for summary disposition of an anticompetitive strike suit. Indeed, at oral argument, counsel for the United States quite understandably would not give a definitive answer as to whether the test was met in this very case, saying only that "[t]his is a very difficult case for that purpose." Tr. of Oral Arg. 19.

It is true, of course, that the person seeking to exclude new entrants would have to establish the nonfunctionality of the design feature, see § 43(a)(3), 15 U. S. C. § 1125(a)(3) (1994 ed., Supp. V)—a showing that may involve consideration of its esthetic appeal, see *Qualitex, supra,* at 170. Competition is deterred, however, not merely by successful suit but by the plausible threat of successful suit, and given the unlikelihood of inherently source-identifying design, the game of allowing suit based upon alleged inherent distinctiveness seems to us not worth the candle. That is especially so since the producer can ordinarily obtain protection for a design that *is* inherently source identifying (if any such exists), but that does not yet have secondary meaning, by securing a design patent or a copyright for the design—as, indeed, respondent did for certain elements of the designs in this case. The availability of these other protections greatly reduces any harm to the producer that might ensue from our conclusion that a product design cannot be protected under § 43(a) without a showing of secondary meaning.

Respondent contends that our decision in *Two Pesos* forecloses a conclusion that product-design trade dress can never be inherently distinctive. In that case, we held that the trade dress of a chain of Mexican restaurants, which the plaintiff described as "a festive eating atmosphere having

interior dining and patio areas decorated with artifacts, bright colors, paintings and murals," 505 U. S., at 765 (internal quotation marks and citation omitted), could be protected under § 43(a) without a showing of secondary meaning, see *id.,* at 776. *Two Pesos* unquestionably establishes the legal principle that trade dress can be inherently distinctive, see, *e. g., id.,* at 773, but it does not establish that *product-design* trade dress can be. *Two Pesos* is inapposite to our holding here because the trade dress at issue, the décor of a restaurant, seems to us not to constitute product *design.* It was either product packaging—which, as we have discussed, normally *is* taken by the consumer to indicate origin—or else some *tertium quid* that is akin to product packaging and has no bearing on the present case.

Respondent replies that this manner of distinguishing *Two Pesos* will force courts to draw difficult lines between product-design and product-packaging trade dress. There will indeed be some hard cases at the margin: a classic glass Coca-Cola bottle, for instance, may constitute packaging for those consumers who drink the Coke and then discard the bottle, but may constitute the product itself for those consumers who are bottle collectors, or part of the product itself for those consumers who buy Coke in the classic glass bottle, rather than a can, because they think it more stylish to drink from the former. We believe, however, that the frequency and the difficulty of having to distinguish between product design and product packaging will be much less than the frequency and the difficulty of having to decide when a product design is inherently distinctive. To the extent there are close cases, we believe that courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning. The very closeness will suggest the existence of relatively small utility in adopting an inherent-distinctiveness principle, and relatively great consumer benefit in requiring a demonstration of secondary meaning.

* * *

We hold that, in an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning. The judgment of the Second Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*