**HEALTH INSURANCE ASSOCIATION OF AMERICA, Plaintiff,**

**v.**

**Goddard Claussen Porter NOVELLI, et al., Defendants.**

**Civil Action No. 02–0831 (RBW).**

United States District Court, District of Columbia.

May 17, 2002.

Daniel E. Johnson, Shari Klevens, McKenna & Cuneo, LLP, Washington, DC, for Plaintiff.

William Webber, Morgan, Lewis & Bockius, LLP, Washington, DC, Richard

Ben-Veniste, Mayer, Brown, Rowe & Maw, Washington, DC, for Defendant.

### AMENDED MEMORANDUM OPINION

WALTON, District Judge.

This matter is before the Court on plaintiff's application for a temporary restraining order[1] and motion for a preliminary injunction, defendants' Goddard Claussen Porter Novelli's ("Goddard") and Cures-Now Action's ("CuresNow")[2] oppositions to plaintiff's motions, and plaintiff's reply to defendants' oppositions. Upon consideration of the arguments advanced by the parties during the hearing on plaintiff's motions that was held on May 13, 2002, and the positions raised in the parties pleadings, the Court concludes that plaintiff's motions must be denied.

### I. Summary of Facts

The plaintiff, Health Insurance Association of America ("HIAA"), is an organization comprised of traditional risk-bearing organizations, such as health insurers, managed care organizations, and reinsurers that "attempt[ ] to shape and influence state and federal public policy through advocacy." (Compl.¶ 4.)[3] In 1993, as part of its campaign opposing then-President Clinton's proposed health care initiatives, HIAA retained defendant Goddard, a company that provides public relations and public affairs services, to aid it in creating a national advertising campaign. (Id. ¶¶ 6–7.) The campaign resulted, in part, in the creation of the "now famous Harry and Louise advertisements." (Id. ¶¶ 9–10.)[4]

There are several features of the "Harry and Louise" advertisements which, HIAA contends, make them distinctive: the actors used in the advertisements are the same;[5] there is a piano playing soft music

1. On May 2, 2002, the date plaintiff filed its motions, the Court declined to hear plaintiff's request for an ex parte hearing on its application for a temporary restraining order and concluded that the interests of efficiency would be best served by conducting a hearing on the preliminary injunction with all the parties to this matter present. Therefore, the application for a temporary restraining order was decided contemporaneously with the motion for a preliminary injunction.

2. Defendant CuresNow Action was incorrectly named CuresNow in plaintiff's complaint and motions papers. CuresNow is a related non-profit organization that is exempt from taxation under section 501(c)(3) of the Internal Revenue Code. (Opposition of CuresNow Action to Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction ("CuresNow Opp.") at 1 n. 1.) CuresNow Action is exempt from taxation under Section 501(c)(4) of the Internal Revenue Code and is the organization responsible for funding the advertisements at issue. (Id.) However, for the sake of simplicity, the Court will refer to CuresNow Action as Cures-Now.

3. References to "Compl." are to the plaintiff's verified complaint that was filed on May 2, 2002.

4. The "Harry and Louise" advertisements were so named by members of the press based upon the two characters portrayed in the advertisements. (Compl.¶ 11.) In fact, the actors who were retained for the advertisements were Harry Johnson and Louise Claire Clark, which provides a simple explanation as to how the advertisements came to be referred to as the "Harry and Louise" advertisements.

5. Goddard contracted directly with the actors and each actor executed agreements for the periods of 1993–1994 and 1994–1995 not to "participate in any promotion for 'insurance companies' or 'issue advocacy campaign' through August 31, 1995." These agreements were never extended beyond these initial terms. (Memorandum of Points and Authorities of Defendant Goddard Claussen Porter Novelli in Opposition to Plaintiff's Application for a Temporary Restraining Order and Motion for a Preliminary Injunction ("Goddard's Opp."), Declaration of Benjamin Goddard ("Goddard Decl.") ¶ 6.)

in the background; the characters have a colloquy in "worried tones" regarding a serious political issue; and there is contact information displayed at the end of the advertisement informing viewers how they can express their views. (*Id.* ¶ 9.)[6] In addition the characters normally act according to specified roles, with Louise typically being "educative" and Harry being "reactive." (*Id.*)

Throughout 1993–1994, there were 13 "Harry and Louise" advertisements created. (Goddard Decl. ¶ 4.) The first six were created pursuant to an oral agreement;[7] the remaining advertisements were completed pursuant to a written agreement executed between HIAA and Goddard in 1994. Section VI of the 1994 agreement (the "Termination" section) provides that:

> "[a]ll advertising copy and tapes and all other work product, including mailing lists, developed as a result of this campaign, are and shall be the property of the Client; however, this shall not prevent [Goddard] from using, as a sample of its work, any materials produced for use in the campaign."

(Goddard Decl. Ex. A.) HIAA and Goddard executed another agreement in 1998 wherein they included more specific language regarding copyright ownership, however, this agreement did not specifically refer to the Harry and Louise advertisements at issue, but dealt with the subject of "public relations counseling and communications services." (Compl.Ex.A).[8] In 2000, HIAA again retained Goddard to create advertisements in connection with an effort named "InsureUSA," HIAA's initiative to increase and expand health insurance coverage among uninsured Americans. (*Id.* ¶ 13.) Again, actors Harry Johnson and Louise Claire Clark were used in these commercials.

On April 23 and 24, 2002, Benjamin Goddard, Goddard's executive creative director, informed individuals at HIAA that Goddard had created political advocacy advertisements for defendant CuresNow, a non-profit organization that is a member of the Coalition to Advance Medical Research and an advocate that supports therapeutic cloning.[9] (*Id.* ¶ 6.) The advertisements, which were created as a part of CuresNow's campaign against proposed Congressional legislation that will criminalize therapeutic cloning,[10] are very similar to

---

6. In addition, some of the "most famous Harry and Louise" advertisements also feature the setting of Harry and Louise seated at their kitchen table with both characters wearing business attire. (Compl.¶ 9.)

7. *See* Goddard Decl. ¶ 6.

8. The Declaration of Carolyn C. Tieger ("Tieger Decl."), a Goddard partner, declares that the 1998 agreement pertained to "the general promotion of HIAA and its then President-elect, Charles Kahn[ ]" for which HIAA agreed to pay Goddard a minimum monthly retainer of $5000 per month. (Tieger Decl. ¶¶ 3–4.)

9. Specifically, CuresNow advocates Somatic Cell Nuclear Transfer ("SCNT"), a form of therapeutic cloning that has the potential to treat cancer, heart disease, Parkinson's disease, Alzheimer's disease, and other illnesses.

(CuresNow Opp. at 5.) SCNT involves removal of the nucleus from a recipient's skin cell and placing it into an unfertilized human egg cell that has had its nucleus removed, from which scientists can derive stem cells that can be used to create new human cells wherever they are needed, such as to heal damaged nerves in the spinal cord. (*Id.*) Therapeutic cloning is not the same as reproductive cloning, which involves the replication of an entire human being. (*Id.* at 6.)

10. Currently, Senators Sam Brownback (Republican–Kansas) and Mary Landrieu (Democrat–Louisiana) have sponsored Senate Bill 1899, which is popularly referred to as the Brownback–Landrieu bill, that if enacted would impose criminal penalties on scientists who engage in SCNT research, as well as individual patients who might receive SCNT therapy in foreign counties. (CuresNow Opp.

the advertisements Goddard had created for HIAA, and in fact use the same actors, the same business attire, the same background music, the same setting, the same "worried" tones, the same actor roles and the same display of contact information at the end of the advertisement, although the CuresNow advertisements instruct viewers to contact CuresNow, not HIAA. (*Id.* ¶ 23.) News releases issued by CuresNow and Goddard specifically refer to the advertisements as the Harry and Louise advertisements. (*Id.*) [11]

On April 30 and May 1, 2002, HIAA filed copyright registration forms, submitted the deposits, and paid the required fees to register the copyrights for its Harry and Louise advertisements and their formats. (*Id.* ¶ 30.) HIAA specifically checked the box on its registration forms designated for "works made for hire." [12] (*See* Compl. Ex. E.) [13]

In addition to its copyright position, HIAA claims that it owns the "trade dress" in the format of the Harry and Louise advertisements, which is protectible under the Lanham Act, 15 U.S.C. § 1125(a) (1994). HIAA argues that it is entitled to a preliminary injunction because it has established a substantial likelihood of success on the merits of its trademark infringement claim [14] and is being irreparably harmed by continued dissemination of the CuresNow advertisements because they confuse the public as to whether HIAA sponsors therapeutic cloning [15] and permits CuresNow to unjustly benefit from HIAA's goodwill.

Defendant Goddard argues that HIAA does not own the copyrights in the Harry and Louise advertisements because HIAA did not, despite its argument to the contrary, co-author the advertisements, the parties never contracted to transfer Goddard's copyright in the advertisements, and the advertisements were not intended to be works made for hire. Therefore, Goddard submits that it is the copyright owner of the Harry and Louise advertisements. In addition, Goddard contends

---

at 6.) The Senate is expected to vote on the proposed bill within the next several weeks.

11. In addition, the front page of CuresNow's website states "CuresNow Brings Back 'Harry and Louise' to Communicate with Lawmakers." (Compl. § 21.)

12. A "work made for hire" is a work that is either prepared by an employee in the scope of his employment or a "work specially ordered or commissioned for use ... as a part of a motion picture or other audiovisual work." 17 U.S.C. § 101 (1994 & Supp. V 1999). The parties must "expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." *Id.*

13. HIAA also claims it has a protectible copyright interest in the Harry and Louise advertisements and their format based on the 1998 agreement executed with Goddard. In addition, HIAA states that Goddard has previously asked HIAA and others to use the "Harry and Louise" format to promote other organizational causes and HIAA has refused to grant such permission. (*Id.* ¶ 16.)

14. During oral argument, counsel for HIAA conceded that there are currently problems with the development of the facts it needs to establish a substantial likelihood of success on its copyright infringement claim. The Court agrees with this candid assessment because there are several factual disputes between the parties regarding the scope of the contractual rights the 1994 and 1998 agreements conveyed to HIAA, whether in fact there is any evidence that supports that Goddard created the Harry and Louise advertisements as "works made for hire," and whether HIAA and Goddard are co-authors of the advertisements. These disputes condemn HIAA's plea for injunctive relief based on its copyright claim. *See* discussion *infra* at 10–12.

15. HIAA alleges that members of the public have already contacted its offices to inquire why it is endorsing cloning. (Compl. ¶ 25.)

that HIAA does not own any trade dress rights to the format of the advertisements. Finally, both defendants argue that the balance of equities tilt in their favor because if injunctive relief is granted at this time, CuresNow would be prohibited from continued dissemination of its political advertisements at a critical point of its campaign and that it would not have the time or the money to begin a new advertisement campaign just weeks before the Senate's scheduled vote on the proposed therapeutic cloning legislation.

## II. *Analysis*

### A. *Standard for Granting Injunctive Relief*

The Court must apply the familiar four-prong test in determining whether HIAA is entitled to injunctive relief. This test requires the Court to ask whether (1) HIAA has demonstrated that there is a substantial likelihood that it will prevail on the merits of one of its claims; (2) whether HIAA has shown that it would be irreparably harmed if injunctive relief is not awarded; (3) whether the issuance of injunctive relief would not "substantially harm" the other parties, and (4) whether awarding the relief is in the public interest. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977) (citing *Virginia Petroleum Jobbers Assoc. v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958)).

In applying this test, district courts "employ a sliding scale under which a particularly strong showing in one area can compensate for weakness in another." *Sociedad Anonima Vina Santa Rita v. Department of the Treasury*, 193 F.Supp.2d 6, 13–14 (D.D.C.2001) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C.Cir.1995)). Under this sliding scale, injunctive relief may be issued where, for example, the moving party has made a particularly strong showing of success on the merits

"even if there is a relatively slight showing of irreparable injury." *Id.*, at 13–14 (quotation omitted). However, "a party seeking preliminary injunctive relief must demonstrate at least some irreparable injury because 'the basis for injunctive relief in the federal courts has always been irreparable harm.'" *Id.* (quotation omitted). A harm is "irreparable" only if it is "both certain and great." *Id.* (citation omitted). The failure of the moving party to demonstrate irreparable harm is sufficient reasons for the district court to refuse to grant injunctive relief. *Id.*

In its motions, HIAA argues that a temporary restraining order, or alternatively, a preliminary injunction is necessary to preserve "HIAA's reputation" and the "value of its intellectual property." (HIAA's Application for a Temporary Restraining Order ("HIAA's App.") at 11.) In copyright infringement cases, "[a] copyright holder may be presumed to suffer irreparable harm as a matter of law when his right to the exclusive use of copyrighted material is invaded, and such a holder is entitled to a preliminary injunction without a detailed showing of harm." *Hart v. Sampley*, No. CIV.A.91–3068, 1992 WL 100135, at *3 (D.D.C. Feb.4, 1992) (citations omitted). Similarly, "[t]rademark infringement by its very nature causes irreparable injury." *Appleseed Foundation Inc. v. Appleseed Inst., Inc.*, 981 F.Supp. 672, 677 (D.D.C.1997) (citations omitted). Thus, if the Court finds that plaintiff has demonstrated a substantial likelihood of success on the merits of either its copyright or trademark infringement claims, it is not necessary for plaintiff to provide overwhelming evidence in support of its showing of irreparable injury.

### 1. *Likelihood of Success*

#### (a) *Copyright Infringement Claim*

To establish a likelihood of success on the merits of its copyright infringement

claim, HIAA must prove ownership of a copyright and copying by the defendant. *Hart*, 1992 WL 100135, at \*2 (citation omitted). In addition, copyright infringement "is ordinarily established by proof of (1) defendants' access to the copyrighted material and (2) substantial similarity between that material and the allegedly infringing material." *Id.* (citation omitted).

■ In this case, there is a substantial dispute regarding ownership of the copyrights of the Harry and Louise advertisements. The parties do agree that there are three possible ways copyright ownership could have been vested in HIAA: (1) If HIAA was a co-author of the advertisements (*see* 17 U.S.C. § 201(a) (1994)); (2) transfer of Goddard's copyright to HIAA (*see* 17 U.S.C. § 201(d)); or (3) if the work was created as a work made for hire (*see* 17 U.S.C. § 201(b)). However, the record is devoid of any evidence that HIAA co-authored the Harry and Louise advertisements;[16] there is no unambiguous language in the 1994 or 1998[17] agreements clearly conveying the copyrights of the Harry and Louise advertisements to

HIAA; and the language of the 1994 agreement, nor the conduct of the parties, explicitly convey the parties' intent to have the advertisement constitute "works made for hire."

Given the lack of clear evidence regarding HIAA's alleged ownership of the copyrights to the Harry and Louise advertisements, the Court can not conclude that HIAA has established that it is likely, to a substantial degree, to prevail on its copyright infringement claim. The Court must therefore analyze whether HIAA made that showing on its trade dress infringement claim.

### (b) *Trade Dress Claim*

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in part:

"any person who, on or in connection with goods or services, . . . uses in commerce any word, term, [or] name, . . . which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship or approval of

---

16. Although HIAA argues that it is entitled to co-author status because it worked closely with Goddard in creating the advertisements, Goddard has submitted the declaration Benjamin Goddard stating that he is the sole creator of the advertisements. (Goddard Decl. ¶ 4.) To the contrary, HIAA has not submitted any affidavits, declarations, or any other proof that someone associated with its organization allegedly co-authored the advertisements with Goddard. All HIAA's counsel did is argue the point. A "joint work" is one prepared by co-authors "with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. No such intention has been demonstrated to the Court at this juncture. Therefore, HIAA has failed to establish that it is likely to succeed on its argument that it is entitled to co-author copyright ownership of the advertisements.

17. Plaintiff argues that its 1998 agreement with Goddard, in which Goddard conveyed all the rights in the advertising it created to HIAA, prevent Goddard from using the Harry and Louise format. However, the 1998 agreement did not concern the 1993–94 or 2000 advertisements but dealt with different services HIAA received from Goddard. (Tieger Decl. ¶¶ 3–4.) It therefore has no bearing on the Harry and Louise advertisements. However, the 1998 agreement did contain a specific provision pertaining to "works made for hire" that provides "[t]o the extent that any of the materials deliverable under this Agreement may not, by operation of law, be Works Made For Hire, [Goddard] shall attempt to obtain an assignment thereof to Client providing for the ownership of copyright in the deliverable items." (Compl. Ex. A at § V(B).) This language demonstrates that plaintiff knew how to establish a work made for hire relationship.

his or her goods, services or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

This provision has been construed to provide protection against infringement of an unregistered trade dress. *See Wal–Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 209, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000); *see also*, 15 U.S.C. § 1125(a)(3) (Supp. V 1999) (specifically referring to "civil action[s] for trade dress infringement ... for trade dress[es] [that are] not registered on the principal register."); *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) ("[p]rotection of trade dress, no less than of trademarks, serves the [Lanham] Act's purpose to 'secure to the owner of the mark [or dress] the goodwill of his business and to protect the ability of consumers to distinguish among competing producers.' ").

▮▮▮▮ A trade dress is that which makes a business or organization distinguishable from others. *Wal–Mart, Inc.*, 529 U.S. at 211, 120 S.Ct. 1339. A trade dress is "distinctive and capable of being protected [under the Lanham] Act if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc.*, 505 U.S. at 769, 112 S.Ct. 2753 (emphasis in original) (citations omitted).

A trade dress that is "inherently distinctive" identifies "products or services as coming from a specific source ..." *Id.* at

773, 112 S.Ct. 2753. An inherently distinctive trade dress is normally "arbitrary" "fanciful" or "suggestive." *Wal–Mart Stores, Inc.*, 529 U.S. at 211, 120 S.Ct. 1339. If a trade dress is not inherently distinctive, it must be shown to have secondary meaning. *Two Pesos, Inc.*, 505 U.S. at 769, 112 S.Ct. 2753. To determine whether secondary meaning is in play, the Court must inquire "as to whether the [trade dress] 'inspires an association in the minds of the relevant ... [viewing] public between the name of the product and the product itself or its source.'" *Russian Academy of Sciences v. American Geophysical Union*, No. 98–2165, 1998 U.S. Dist. LEXIS 20598, at *12 (D.D.C. Dec. 16, 1998) (citation omitted). Thus, to have secondary meaning, it must be demonstrated that " 'in the minds of the public, the primary significance of a [trade dress] is to identify the source of the product rather than the product itself.' " *Wal–Mart Stores, Inc.*, 529 U.S. at 211, 120 S.Ct. 1339 (citation omitted).

HIAA argues that it has established ownership of the "Harry and Louise" trade dress "based on its use of the combination of features that make up the trade dress." (Pl.'s App. at 8.) These features include the actors [18] used in the advertisements; the roles played by the actors; the setting of the advertisements, the discussion and tone regarding a serious political issue; and the display of contact information at the end of the advertisement informing viewers how they can express their views on the subjects of the advertisements. In

---

**18.** An advertisement published in the "Roll Call" by HIAA reads "Harry and Louise: Original or Cloned?." The text of the advertisement states that "Harry and Louise" are "the original spokespersons for the private health insurance industry. Harry and Louise—identified with HIAA, the voice of America's health insurers." (Tieger Decl. Ex. A(12)). However, HIAA does not have an

exclusive agreement with the actors; nor can HIAA claim a right to the actors Harry and Louise as it was not responsible for their creation. *See Chuck Blore*, 674 F.Supp. at 676 (plaintiff advertising agency could not claim a copyright in its use of actress Deborah Shelton in its commercials as "they did not create her.")

effect, HIAA argues that its purported trade dress in the advertisements produced for CuresNow identifies HIAA to the public as the source of the message being presented in the advertisement, regardless of the content of the message itself.

 Assuming, without deciding, that the features HIAA argues are distinct to the Harry and Louise advertisements are a protectable trade dress under the Lanham Act, the evidence presented by HIAA at this stage does not support its claim that the alleged trade dress is protectable under the Lanham Act. This is so because HIAA has failed to establish that its trade dress is "inherently distinctive," because it has not submitted any evidence that consumers regard its trade dress as an indication that a message is being communicated by HIAA. *See Wal–Mart Stores, Inc.*, 529 U.S. at 213, 120 S.Ct. 1339 ("where it is not reasonable to assume consumer predisposition to take an affixed word or packaging as indication of source ... inherent distinctiveness will not be found."). HIAA has not submitted any evidence of such public "predisposition to equate the feature[s]" of the Harry and Louise advertisements with HIAA. *Id. Cf. Appleseed Foundation Inc. v. Appleseed Inst., Inc.*, 981 F.Supp. 672, 675 (D.D.C.1997) (holding plaintiff organization's name "Appleseed" was "arbitrary, and therefore ... distinctive"). Nor is there sufficient evidence that this purported trade dress has acquired secondary meaning in the minds of the public such that viewers, have come to identify the advertisements as the products of HIAA. *Cf. Russian Academy of Sciences*, 1998 U.S. Dist. LEXIS 20598, at *12–13 (holding that plaintiff's journal title, "Geomagnetism and Aeronomy" had acquired secondary meaning "because the relevant market associates that title with the [Russian] Academy's journal," which

had been published under that title "for nearly forty years."). Although HIAA states that "members of the public" have already called its offices to inquire why HIAA supports cloning, this claim, supported solely by HIAA's verified complaint, is not sufficient. *Cf. Chuck Blore*, 674 F.Supp. at 681 (holding there was an issue of material fact as to whether there was a strong likelihood of confusion regarding the plaintiff's and defendant's commercial where plaintiff submitted two affidavits in support of this fact). More must be demonstrated, because as counsel for HIAA candidly admitted, he could not represent whether it was only two individuals who contacted HIAA to express their confusion. Even more troubling, however, is the "fact that all the complaint states is that"[m]embers of the "public have contacted HIAA and asked why HIAA is endorsing cloning." (Compl. ¶ 25.) While the impetus for the inquiries may have been CuresNow's advertisements, a definitive statement to that effect is not before the Court. On balance, this is just not enough to invoke the extraordinary remedy of injunctive relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (noting that a " 'preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.' ") (citation omitted) (emphasis added).

The cases relied on by HIAA do not change this result. These cases simply establish that a public advocacy organization can be entitled to protection under the Lanham Act if another organization infringes on the use of its trademark. *See, e.g., United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 88 (2d Cir.1997) (holding that the Lanham Act protected plaintiff, a political organization, from defendant's in-

fringing use of plaintiff's registered service mark "United We Stand America, Inc." with defendant's "United We Stand, America New York, Inc."); *Appleseed*, 981 F.Supp. at 673–74 (holding that the Lanham Act protected plaintiff's federal service mark registration that it received for "Appleseed Center for Law and Justice" from defendant's continued use of the name "Appleseed Institute"). The reasoning of these cases is clear, because, as the *United We Stand* court stated,

> "[i]f different organizations were permitted to employ the same trade name in endorsing candidates, voters would be unable to derive any significance from an endorsement, as they would not know whether the endorsement came from the organization whose objectives they shared or from another organization using the same name ... [and t]he resulting confusion would be catastrophic[.]"

128 F.3d at 90.

This is not the situation here. In this case, while CuresNow has used the same advertising format to convey its message, it has not used HIAA's organizational name in doing so. The advertisements clearly state that they are sponsored by "CuresNow" and provide CuresNow's contact information as they are ending. Any discerning viewer would clearly be able distinguish the source of the advertisements as not being HIAA by reading the information displayed on the screen. Although HIAA states that "members of the public who have seen CuresNow advertise-

ments have asked HIAA why it is endorsing cloning," (Pl.'s App. at 11), this is hardly evidence that the confusion in this case has been "catastrophic." *See Chuck Blore & Don Richman, Inc. v. 20/20 Advertising Inc.*, 674 F.Supp. 671, 682 (D.Minn.1987) (holding that although plaintiff established defendant had infringed on plaintiff's copyright in its commercials, the court could not grant summary judgment on plaintiff's Lanham Act claim as there was an "issue of material fact" regarding the "likelihood of actual confusion between the [two commercials]."). And, as indicated above, the complaint fails to allege that the individuals who contacted HIAA had actually viewed the advertisements and that is why they had made the inquiries. Thus, plaintiff has failed to demonstrate that it is likely to succeed in establishing that it owns a recognizable trade dress in the Harry and Louise advertisements [19] that is so inherently distinctive or that has acquired a secondary meaning such that the public would necessarily identify HIAA as the source of the advertisements based on the advertising features it seeks to protect.[20]

### 2. *Irreparable Harm, Harm to Defendants and the Public Interest*

■ Because the Court concludes that plaintiff has failed to demonstrate a substantial likelihood that it will prevail on its copyright or trade dress claims, it does not have to engage in a detailed discussion of whether or not plaintiff has demonstrated irreparable harm. Plaintiff claims that the

---

**19.** Defendant Goddard also claims that plaintiff's trade dress claim fails because the television spots are not used in connection with goods or services in connection with commerce. (Goddard's Opp. at 20.) However, the Court declines to reach this issue at this preliminary stage of the proceedings.

**20.** In addition, it is not clear to the Court that plaintiff would be able to establish ownership

of a trade dress in the format of the Harry and Louise advertisements without also having the copyrights to the same advertisements. However, the Court need not address this issue at this time as it finds that plaintiff has failed to demonstrate that the trade dress it seeks to protect is inherently distinctive or has acquired a secondary meaning.

continued dissemination of defendants' advertisements will continue to injure its "goodwill" and will confuse its members about whether or not HIAA supports therapeutic cloning. However, plaintiff has offered no evidence that it has, at this point, suffered any irreparable harm, aside from the statement in its verified complaint stating that "members of the public" have called and asked why HIAA endorses therapeutic cloning. This hardly amounts to a showing of irreparable harm, given the fact that the CuresNow advertisements have been airing since at least mid to late April, and HIAA has not provided any affidavits or declarations supporting its claims of irreparable harm.

In any event, to establish its entitlement to injunctive relief, HIAA must demonstrate that issuance of an injunction would not harm the other parties in this case. The Court finds that the balance of harm in this case favors the defendants. *See Belushi v. Woodward,* 598 F.Supp. 36, 37 (D.D.C.1984) (when seeking a preliminary injunction, "plaintiff must establish that defendants will not be unduly harmed by the issuance of relief."). CuresNow would clearly be harmed if, just weeks prior to a Senate vote on a bill it is opposing, it was forced to cease dissemination of its advertisements and had to devise a new campaign almost immediately. In a situation like this, the third factor governing issuance of injunctive relief weighs in favor of the defendants. *See Nikas v. Vietnam Veterans of America, Inc.,* No. CIV.A.92–2459, 1992 WL 336495, at *5 (D.D.C. Nov.6, 1992) (declining to issue preliminary injunction where it appeared plaintiff was unlikely to prevail on their copyright and trademark infringement claims and where an injunction against the sale of defendants' products and distribution of their literature would "greatly disrupt the promotional and fundraising plans of defendants for a Veterans Day event and

clearly could substantially harm [their] national reputation."); *Belushi,* 598 F.Supp. at 37 (denying to grant plaintiff a preliminary injunction in a copyright infringement case where defendant sold a book containing infringing pictures belonging to plaintiff because, although plaintiff demonstrated a likelihood of success on the merits of her claim, defendants would have lost a substantial amount in sales and legal remedies were available to plaintiff to adequately address her injuries.).

Finally, based on the record and the Court's findings as set forth above, the Court also finds that the public interest will be enhanced by not granting the requested relief. At this critical time in the debate on an issue of significant public importance, continued debate on the issue is of utmost importance to the legislative process. Input to Congress from American citizens will surely not be advanced by shutting down CuresNow's advertisement campaign. It may be advanced however if airing of the advertisements continue. *See Belushi,* 598 F.Supp. at 37 (finding that although the public interest favors enforcement of copyright laws, the competing public interest in "the promotion of free expression and robust debate" weighed in favor of not issuing an injunction).

*Conclusion:*

For the reasons stated above, plaintiff's motions for a temporary restraining order and a preliminary injunction are hereby denied.

### *ORDER*

For the reasons set forth in the Memorandum Opinion that accompanies this Order, it is hereby

ORDERED that plaintiff's application for a temporary restraining order is denied; it is further

ORDERED that plaintiff's motion for a preliminary injunction is denied. It is further

ORDERED that the defendants shall file their respective answers to plaintiff's complaint in accordance with the Federal Rules of Civil Procedure. Thereafter the Court will schedule an initial scheduling conference so that the matters in this case may be resolved as expeditiously as possible.