NOTE:  Pursuant to Fed. Cir. R. 47.6, this disposition
is not citable as precedent.  It is a public record.

# United States Court of Appeals for the Federal Circuit

04-1072, -1073, -1091

DECORATIONS FOR GENERATIONS, INC.,

Plaintiff-Cross Appellant,

v.

HOME DEPOT USA, INC.,

Defendant-Appellant,

and

INTERNATIONAL BUSINESS CORPORATION and MUTUAL ALLIED, LTD.,

Defendants-Appellants,

and

MARK LU,

Defendant.

_____

DECIDED:  March 8, 2005

_____

Before LOURIE, Circuit Judge, ARCHER, Senior Circuit Judge, and PROST, Circuit Judge.

PROST, Circuit Judge.

The appellants, Home Depot USA, Inc. (Home Depot), International Business Corporation (IBC) and Mutual Allied, Ltd. (MA), appeal the District Court for the Eastern District of California's denial of their motion for judgment notwithstanding the verdict.

<u>Decorations for Generations, Inc. v. Home Depot USA, Inc.</u>, No. CIV-S-01-0284 DFL PAN (E.D. Cal. Sep. 22, 2003) (District Court Opinion). Because the jury's verdict finding that the appellants infringed the trade dress of the appellee, Decorations for Generations, Inc. (DFG), was not supported by substantial evidence, we <u>reverse</u> the district court's denial of judgment notwithstanding the verdict.

BACKGROUND

Since 1990, DFG has manufactured a steel Christmas tree stand. DFG chief executive officer James Boucher designed the stand in 1988 out of scrap steel parts that he had in his garage. As designed by Boucher and sold by DFG, the stand is comprised of a one-foot steel pipe (intended to contain the tree base), a six-inch square plate of flat steel (that serves as a base), and four legs protruding from the corners of the base and made of 24-inch long steel bars. The stand also includes four screws that are meant to secure the tree by fitting into apertures that are evenly spaced around the steel pipe component. In order to evoke Christmas colors, DFG's stand was colored green and red, with the base and body of the stand colored green and the rim of the stand covered by a red plastic covering.

In 1990, Mr. Boucher applied for a design patent for his Christmas tree stand. In November of 1992, he was granted U.S. Design Patent No. Des. 330,875 based on that application.

DFG began selling Mr. Boucher's stand during the holiday season of 1989. In 1993, after receiving outside suggestions, it began selling the stand in an open-topped white box. Since the modification of the display box, the DFG stand has sold in the same configuration.

In 1999, Home Depot designed a heavy-duty Christmas tree stand whose design was roughly similar to DFG's stand. Home Depot had arranged through IBC to have the stand manufactured by MA in China. When Home Depot later discovered that DFG's stand was covered by a design patent, it developed another design for its tree stand in order to avoid infringing the DFG patent.[1]

In February of 2001, DFG sued Home Depot, MA and IBC for infringement of its design patent, trade dress infringement under the Lanham Act and unfair competition under common law and California statute. In September 2002, at the summary judgment stage of litigation, the district court granted summary judgment to the appellants on DFG's patent infringement claim.[2] In May of 2003, a jury trial on DFG's trade dress and unfair competition claims was held.

Before the jury returned its verdict, the defendants submitted motions for judgment as a matter of law (JMOL) to the district court. The district court declined to consider the defendants' motions in light of the jury's impending verdict. After the jury returned its verdict finding for DFG on its trade dress and unfair competition claims and awarded lost profits, compensatory damages and punitive damages to DFG, the defendants moved for judgment notwithstanding the verdict. The district court sustained the jury verdicts on trade dress infringement and unfair competition but reduced the jury's compensatory and punitive damages verdicts.

---

[1]    Between 1993 and 1999, several other manufacturers made and sold Christmas stands that were similar to the DFG stand. Those manufacturers are not parties to this action.

[2]    DFG is not appealing the district court's grant of summary judgment on the design patent claim in this appeal.

The defendants timely appealed the district court's denial of their motion for judgment notwithstanding the verdict. MA and IBC also appeal the district court's unfair competition verdict.[3] DFG cross-appeals the district court's reduction of the jury's punitive damage award against Home Depot as well as its determination that pre-judgment interest is not available for Lanham Act violations.[4] Because the district court's jurisdiction was based in part on 28 U.S.C. § 1338, we have jurisdiction to hear this appeal under 28 U.S.C. § 1295(a)(1).

DISCUSSION

A. Standard of Review and Choice of Law

For procedural issues not unique to patent law, we apply the standard of review of the circuit from which the case originates. Sjolund v. Musland, 847 F.2d 1573, 1576 (Fed. Cir. 1988). In the United States Court of Appeals for the Ninth Circuit, a jury verdict and a denial of a motion for judgment notwithstanding the verdict are reviewed for substantial evidence. Leatherman Tool Group, Inc. v. Cooper Indus., Inc., 199 F.3d 1009, 1011 (9th Cir. 1999).

For substantive issues not related to patent law, we also apply the law of the Ninth Circuit. See e.g., Nobelpharma AB v. Implant Innovations, 141 F.3d 1059, 1067 (Fed. Cir. 1998). Because the issues on appeal concern trade dress law, the Ninth Circuit's precedent controls for the purposes of this appeal. See Keystone Retaining

---

[3]     As the district court noted, the unfair competition claim asserted against MA and IBC is predicated on a violation of the Lanham Act. Since we find that there was no Lanham Act violation in this case, the unfair competition claim in this case becomes moot.

[4]     Because we reverse the jury's trade dress verdict, we deny DFG's cross-appeals as moot.

Wall Sys., Inc. v. Westrock, Inc., 997 F.2d 1444, 1447-48 (Fed. Cir. 1993) (applying the law of the Ninth Circuit in evaluating a trade dress infringement claim).

## B. The General Law of Trade Dress

As a concept, trade dress is closely related but not identical to trademark. Like trademark, trade dress derives its legal protection from § 43(a) of the Lanham Act. But unlike trademark, trade dress is intended to protect product packaging or design that has come to be associated by consumers with a specific manufacturer or producer. For example, while a two-dimensional symbol or drawing may be considered a trademark, three-dimensional product designs or packaging may, under the right circumstances, be considered trade dress.

The first inquiry in determining whether a product's design can be protected as trade dress under § 43(a) of the Lanham Act is into the functional aspects of the design, with the parties asserting Lanham Act trade dress claims having to first "establish the nonfunctionality of the design feature." Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 214 (2000). Nonfunctionality is required because the buying public "should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves." Id. at 213. Furthermore, because functional aspects of a product's design may gain protection in the form of a patent, trade dress is an inappropriate vehicle through which to protect them. As the Supreme Court observed:

> The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product

designs or functions for a limited time, 35 U.S.C. §§ 154, 173, after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).

Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159,164-65 (1995).

The second inquiry in determining whether trade dress protection is available to a product's design is whether or not the product design has achieved secondary meaning in the minds of consumers. Samara Bros., 529 U.S. at 216. Secondary meaning exists when "in the minds of the public, the primary significance of [the product design] is to identify the source of the product rather than the product itself." Id. at 211 (quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n. 11 (1982)). Put another way, "A plaintiff's trade dress acquires secondary meaning when the purchasing public associates the dress with a particular source." Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 615 (9th Cir. 1989).

The likelihood of consumer confusion between protected trade dress and allegedly infringing trade dress is only considered once the trade dress in question has been established to be protected trade dress (i.e., it is non-functional and it has achieved secondary meaning in the minds of consumers). In the absence of a product design's non-functionality or secondary meaning, likelihood of consumer confusion is irrelevant because without establishing both non-functionality and secondary meaning a plaintiff asserting a product design trade dress infringement claim cannot prevail. See, e.g., Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769 (1992) (holding that to establish a claim for trade dress infringement, secondary meaning, non-functionality and

04-1072, -1073, -1091                                6

likelihood of confusion must all be shown); <u>Talking Rain Beverage Co. v. S. Beach Beverage Co.</u>, 349 F.3d 601, 603 (9th Cir. 2003) (holding the same).

### C.  Trade Dress Law in the Ninth Circuit

Our review of the district court's decision turns on the issue of secondary meaning.  While the Supreme Court laid out the broad outlines of product design trade dress law in <u>Samara Bros.</u>, the Ninth Circuit has further defined the factors to be considered in making secondary meaning determinations.  They include: whether actual purchasers associate the plaintiff's trade dress with the plaintiff's products; the degree and manner of the plaintiff's use of the trade dress; whether the use of the trade dress has been exclusive; and proof of copying.  <u>Vision Sports</u>, 888 F.2d at 615; <u>see</u> <u>also</u>, <u>Levis Strauss & Co. v. Blue Bell, Inc.</u>, 778 F.2d 1352, 1358 (9th Cir. 1985) (en banc).  Other Ninth Circuit precedent identifies actual confusion as an indicator of secondary meaning.[5]  <u>Am. Scientific Chem., Inc. v.  Am. Hospital Supply Corp.</u>, 690 F.2d 791, 793 (9th Cir. 1982).

### D.  DFG's Trade Dress Infringement Claims

The district court identified six factors to be considered in a secondary meaning analysis:

> (1) purchaser perception; (2) degree and manner of advertising; (3) demonstrated utility of trade dress in increasing sales product; (4) length of time and

---

[5]  Evidence of actual confusion in the secondary meaning context is not to be mistaken for the independent likelihood of confusion inquiry that a court must undertake before finding trade dress infringement.  In its jury instructions, the district court itself underscored this point in issuing different instructions for evidence of actual confusion under the secondary meaning analysis and the likelihood of confusion analysis.

exclusivity of use; (5) intentional copying by defendants; (6) evidence of actual confusion.

District Court Opinion at 8-9.

Regarding the first three secondary meaning factors, the district court found that DFG had offered "little or no evidence" at trial. District Court Opinion at 9. We concur with that conclusion. The district court also found, however, that substantial evidence supported a finding that the presence of the last three factors had been established by DFG. We agree with the district court that the fourth factor was supported by substantial evidence but disagree with its conclusion that the fifth and sixth factors were likewise supported by substantial evidence. We discuss these latter three factors in turn.

### 1. Length of Time and Exclusivity of Use

The district court determined that the length of time and exclusivity of use factor in a secondary meaning analysis had been supported by substantial evidence at trial. The defendants argue that because the DFG stand was only in stores five to six weeks a year for only several years, DFG could not satisfy the length of time component of this factor. Furthermore, they assert that because similar stands were being sold in that time period, DFG could not show exclusivity of use at trial.

DFG has been selling its tree stand in roughly the same configuration since the 1993 holiday season. Thus, at the time of suit in 1999, DFG had been selling its tree stand in approximately the same configuration for six years. Even though DFG's stand was on display and on sale for only a limited number of weeks out of each year, as the district court said, "[that] is a sufficient amount of time, year after year, to support a jury finding" on this factor. We concur.

04-1072, -1073, -1091                                    8

In addition, the district court found that substantial evidence would support a jury's finding of exclusive use for DFG given that the competing stands prominently displayed their brand names and were different in overall appearance from the DFG stand. Though this is a close question, the evidence introduced at trial was substantial enough to support a jury's finding that DFG had exclusive use of its tree stand design.

Thus, we find that there was substantial evidence introduced at trial to support the district court's finding that this factor in the secondary meaning analysis was satisfied.

### 2. Intentional Copying of Protected Trade Dress

Before the jury rendered its verdict, the district court declined to specifically instruct the jury that copying functional elements of DFG's tree stand was no trade dress infringement. After the jury's verdict, the district court found only that "[t]here was considerable evidence that defendants intentionally copied [DFG's] protectible [sic] trade dress." District Court Opinion at 12.

Regarding intentional copying, it is the copying of non-functional elements of a product's design that can yield an inference of secondary meaning. Copying functional elements of a competitor's design is not a violation of the Lanham Act. Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 844-45 (9th Cir. 1987). We find that the copied elements of DFG's tree stand that were identified as being non-functional by the district court (i.e., the colors, the plastic rim, and the display box) were, in fact, utilitarian in nature. Furthermore, the key issue in any secondary meaning analysis is whether or not the consuming public has come to associate a certain product design with a certain manufacturer—not whether the defendant engaged in any copying whatsoever. As one

district court in the Ninth Circuit correctly stated, "A defendant's conduct, whether legitimate or reprehensible, has only a tenuous connection to the perceptions of consumers and should not relieve a plaintiff of its burden of showing that it has successfully imbued its design with secondary meaning." Continental Lab. Prods., Inc. v. Medax Int'l, Inc., 114 F. Supp. 2d 992, 1012-13 (S.D. Cal. 2000). The only copying relevant to the intentional copying factor in a secondary meaning analysis is the copying of protected trade dress. While there was evidence introduced that supported the conclusion that the defendants had indeed copied utilitarian features of DFG's tree stand, there was no evidence introduced that the defendants intentionally copied protected trade dress that had been perceived by consumers as originating from a particular manufacturer. Accordingly, we also find that there is no substantial evidence to support a jury finding that the defendants intentionally copied DFG's protected trade dress.

### 3. Actual Customer Confusion

Finally, on the issue of actual customer confusion, the district court asserted that even though DFG had presented no evidence of confusion on the part of actual consumers, it did present evidence of confusion on the part of Home Depot and DFG employees and associates. The court held that this evidence of confusion could have allowed the jury to infer that actual consumers were also confused. District Court Opinion at 12.

DFG indeed presented no evidence of actual customer confusion at trial. As the district court noted, the only evidence of confusion shown by DFG at trial related to the confusion of Home Depot and DFG employees. It is clear from Ninth Circuit precedent

that the key question in determining actual confusion for the purposes of a secondary meaning inquiry is whether consumers or "the relevant buying public" are actually confused. See Japan Telecom, Inc. v. Japan Telecom Am., Inc., 287 F.2d 866, 874 (9th Cir. 2002) (confusion on the part of the buying public is the key to an actual confusion inquiry). We are aware of no precedent in the Ninth Circuit that would allow the confusion of "the relevant buying public" to be inferred by testimony from company employees or associates. The evidence presented at trial by DFG only shows that a few Home Depot and DFG employees and associates may have been confused as to the origins of the tree stands at issue in this case. That evidence is not substantial evidence of actual customer confusion. We therefore disagree with the district court's finding that substantial evidence supported the jury's finding that this factor had been satisfied.

In sum, with regards to our secondary meaning analysis, given that the only factor supported by substantial evidence and established by DFG is the length of time and exclusivity of use of the DFG product design, we find that substantial evidence does not support the finding that the DFG tree stand had established secondary meaning in the minds of consumers.[6]

---

[6] Since we conclude that substantial evidence does not support the jury's finding that the DFG tree stand had established secondary meaning in the minds of consumers, we decline to address whether substantial evidence supported the jury's finding that certain aspects of the tree stand are non-functional.

CONCLUSION

Because the jury's finding that the DFG tree stand design had established secondary meaning in the minds of consumers was not supported by substantial evidence, we reverse the jury's verdict of trade dress infringement. Accordingly, MA and IBC's appeal regarding the jury's unfair competition verdict and DFG's cross-appeals are denied as moot.